IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2013 SEP 24   AM 11 51

STEPHAN HARRIS, CLERK
CHEYENNE

Zacharia C. Cohen,
          pro se,

VS,                                    Case No: S-07-0082
                                       (Dist. Ct. No. CR 16978-B)

Attorney General of the
State of Wyoming,
Wyo. D.O.C. Director
Robert O. Lampert.


## PETITION FOR HABEAS CORPUS

          Comes now, before this Court, Zacharia C. Cohen, herein, Petitioner, Respectfully requests under 28 U.S.C.§ 2254 this Court  to grant the writ of Habeas Corpus by a person in State Custody.


1.     Petitioner is challenging the judgment of conviction of the entered in the Seventh Judicial District Court, in Natrona County, Casper, Wyoming.

2.     Petitioner was sentenced on the 23rd of January, 2007.

3.     Petitioner was sentenced to consecutive Life Without the Possibility of Parole, 13-18 years, and 12 months, all consecutive to an 8-14 year sentence he was serving.

4.     Petitioner was convicted of 6 separate charges: aggravated assault, attempted 1st degree murder, possession of a weapon with unlawful intent, possession of a controlled substance, possession of a controlled substance with intent to deliver, reckless endangerment (misdemeanor).

5.     Petitioner entered a plea of not guilty, and had a jury trial.

6.     Petitioner's trial counsel denied him the opportunity to participate and testify in his own defense before and during trial. In the post-conviction hearing petitioner was

denied the opportunity to be heard and present first hand evidence by the District court.

7.  An appeal was filed in the Wyoming Supreme Court. Docket number, 78 Wyo. 2008, 191 P.3d 956, 958 (Wyo. 2008). The following issue were raised:

I. Whether there was insufficient evidence to prove Petitioner attempted to commit first degree homicide when there was no evidence of a substantial step towards committing first degree homicide.

II. Whether there was insufficient evidence to prove Petitioner committed aggravated assault as charged by the state since there was no evidence of a substantial step towards committing aggravated assault.

III. Whether the district court erred when it denied Petitioner's motion to suppress evidence seized after an illegal stop.

IV. Whether petitioner received an illegal sentence.

8.  The Wyoming Supreme Court affirmed Petitioners' conviction on July 14, 2008.

9.  Petitioner was sent out of state without his legal paperwork before the filing of his direct appeal, for housing. Petitioner then filed a Petition for Post-Conviction relief while housed in an ouof state prison that had no Wyoming case law and very limited legal research available. The Seventh Judicial District Court in Natrona County, Casper Wyoming, received the brief on July 13th, 2009. And later, an Amended Petition for Post-Conviction Relief, (CR-16978-B).

10. Petitioner had given the Wyoming Supreme Court several opportunities to address and fix petitioner's illegal conviction. The Wyoming Supreme Court errored when they denied the direct appeal, and later the Writ of Review. Petitioner now asks this Court to fix the illegal conviction. Petitioner did as this District Court asked and gave the Wyoming Supreme Court yet another opportunity to fix the mistakes it made, but the state Supreme Court refused to address the issues stating time had run out, even though this case has been under some type of review. Petitioner now has no state remedies available to him and this Court has full jurisdiction under all federal habeas requirements.

11.     Petitioner now asserts that his state remedies are now totally exhausted and not decided on the merits. Therefore this Court has complete jurisdiction to address and fix the numerous constitutional violations.

12.     The following are the ineffective assistance of counsel grounds which were raised in the Amended Petition for Post-Conviction Relief and brought before the Wyoming Supreme Court for review:

    1) Appellate counsel failed to raise impermissible 404(b) evidence on direct appeal and trail counsel's ineffectiveness for failing to have the prejudicial 404(b) telephone calls excluded.

    2) Appellate Counsel is ineffective for failing to raise trial counsel's ineffectiveness on direct appeal. Trial counsel is ineffective for failing to investigate Petitioner's methamphetamine detoxification and prominent mental disorders and chemical imbalances that compelled the injurious phone calls.

    3) Trial counsel was ineffective for failing to investigate Petitioner's documented learning disabilities that facilitated the misunderstanding regarding the recording of the injurious telephone calls. Appellate counsel is ineffective for failing to investigate and raise on direct appeal the identical issue.

    4) Appellate counsel is ineffective for failure to raise trial counsel's failure to file a motion to suppress the privileged spousal communication and jail house calls.

    5) Appellate counsel was ineffective for failing to raise Title III of the Omnibus Crime Control and Safe Streets Act and illegally seized calls. Trial Counsel was ineffective for failing to have calls excluded due to Title III.

    6) Appellate and trial counsel were ineffective for failure to raise the United States Constitution Fifth Amendment and Article 1§ 11 of the Wyoming Constitution when the State utilized Petitioner's communications as reliable and truthful evidence against him.

    7) Appellate Counsel failed to raise ineffective assistance of trial counsel for failing to motion the court pretrial, or during Voir Dire for a change of venue.

    8) Appellate Counsel failed to raise on Direct Appeal that the Jury had Members that were bias and predisposed.  Trial counsel failed to adequately Voir Dire potential

jurors and the District Court's inadequate Voir Dire rendered the process virtually meaningless and violated the Wyoming and United States Constitutions.

9) Appellate counsel failed to raise the Brady/Discovery violations by the State. Trial counsel failed to demand that the State surrender the Crime Lab Report of the testing performed on the gun.

10) Appellate and trial counsel are ineffective for failing to correctly and completely argue the insufficient evidence and the duplicity of the charges to convict petitioner of attempted murder, aggravated assault and possession of a weapon with unlawful intent.

11) Trial counsel was ineffective for failing to demand the State produce the twelve pages of discovery. Appellate counsel was ineffective for failing to raise this discovery violation on direct appeal. (These twelve pages were finally given to Petitioner After conviction, appeal were final).

12) Appellate counsel is ineffective for failing to raise the unconstitutional search and seizure of evidence used to convict. Trial counsel is ineffective for failing to have evidence excluded due to the illegal search of 1434 South Melrose residence.

13) Trial counsel tried but was unsuccessful at impeaching Ms. Trimble based on fabrication in her testimony. Appellate counsel failed to raise this prosecutorial misconduct and ineffective Trial counsel on direct appeal.

14) Appellate counsel and Trial counsel failed to investigate and offer the exculpatory testimony of Luther Myers.

15) Trial counsel and Appellate counsel were ineffective for failing to object to, and raise on appeal Special Agent Trimble's prejudicial involvement and influence in petitioner's trial.

16) Trial counsel failed to object to the "expert witness" testimony from Ms. Susan Cerullo, and Appellate counsel failed to raise this on direct appeal, is ineffective counsel.

17) Appellate counsel and trail counsel was ineffective for failing to object to the State committing prosecutorial misconduct by inflaming the jury with the term "Bullet Proof Vest", opposed to the factual term of a "Fragmentation Jacket".

18) Trial counsel failed to object to the alleged gun expert and extremely prejudicial firearm testimony which inflamed the jury. The failure to object to the repeated prejudicial testimony was ineffective assistance of counsel, appellate counsel failed to raise this on direct appeal. The state committed prosecutorial misconduct by this statement.

19) Both the Supreme Court and the District Court relied on the false facts and perjury to support their rulings. Appellate counsel is ineffective for failing to raise these specific facts and argue the additional protections afforded by the Wyoming Constitution Art.1, 4.

20) Appellate counsel is ineffective for failing to raise the eighth amendment violation of cruel and unusual punishment for the charging and conviction of the attempted first degree murder and aggravated assault of Officer Wenberg.

21) Appellate counsel failed to raise the cumulative error effect. Because of the numerous errors made to obtain the unconstitutional conviction.

13. The Respondent moved to dismiss the petition stating that the claims were procedurally barred because the issue could have been raised on direct appeal, but were not, or were not cognizable in post-conviction relief proceedings.

14. The District Court dismissed the claims that did not allege ineffective assistance of counsel and ordered the respondent to answer the remaining claims.

15. Petitioner moved to amend the post-conviction petition and the Court granted the motion.

16. Petitioner's amended petition stated the twenty one (21) issues listed above in pages 2-4 at 10.

17. Respondent filed partial summary judgment which was partially granted and there were six remaining issues. 2,3,8,12,14, and 21.

18. An evidentiary hearing was held on the remaining issues on December 13th 2011. During the hearing the University of Wyoming law students, (Defender Aid), represented Petitioner and presented testimony from Martin Cohen, petitioner's father, Nichole Collier, trial counsel, Teresa Jacobs-Castano, a substance abuse/detoxification expert, and Donna Domonkos, appellate counsel. The District Court prohibited petitioner from

testifying based on the failure of his counsel to list Petitioner as a possible witness during discovery.

19. On January 9th, 2012, the District Court denied Petitioner's Post-Conviction Relief petition.

20. A Petition for Writ of Review or in the Alternative Petition for Writ of Certiorari was filed in the Wyoming Supreme Court. The Wyoming Supreme Court denied the petition. The defender aid program was the only hep (attorneys) that were willing to take the case and they presented the following questions in the writ of review to the Wyoming Supreme Court:

    I.    Whether trial and appellate counsel were effective given their failure to investigate Mr. Cohen's Methamphetamine detoxification and mental instabilities especially given the importance of such information in attacking the statement which was critical to the State's evidence of premeditation?

    II.    Whether trial counsel mentioning Mr. Cohen's prior drug conviction during jury selection and appellate counsel's failure to raise this unreasonable prejudicial conduct on appeal was ineffective assistance of counsel?

    III.    Whether the District Court abused its discretion in refusing to let Mr. Cohen testify at the post-conviction evidentiary hearing?

    IV.    Does the interest of justice require this Court to provide Mr. Cohen with some appellate review of the District Court dismissal of his post-conviction petition, or extraordinary relief to ensure that Mr. Cohen due process to effective assistance of counsel is protected?

1. Petitioner now requests this United States District Court to address the constitutional violations and issues stated in the direct appeal, post-conviction relief petition, and the Petition for Writ of Review or in the Alternative Petition for Writ of Certiorari. The above issues are exhausted and the abuse of discretion by the state court system needs to be addressed and petitioner prays this Court will grant the petition for habeas corpus.

2. Petitioner presents the exhausted issues in order they were presented to the Wyoming Court system: These were two of three issues presented to the Wyoming Supreme Court through the public defender in direct appeal;

I.  Whether there was insufficient evidence to prove Petitioner attempted to commit first degree homicide when there was no evidence of a substantial step towards committing first degree homicide?

II.  Whether there was insufficient evidence to prove Petitioner committed aggravated assault as charged by the state since there was no evidence of a substantial step towards committing aggravated assault.

Petitioner now adds to the information raised in the direct appeal; see appendix labeled direct appeal.

1.  Appellate and trial counsel are ineffective for failing to correctly and completely argue the insufficient evidence and the duplicity of the charges to convict petitioner of attempted murder, aggravated assault and possession of a weapon with unlawful intent.

2.  Petitioner emphatically maintains that the gun was never maliciously or intentionally pointed at anybody, and specifically not at law enforcement personnel. The State in its opening remarks, declared that the gun "falls out of petitioner's hand". There is no intent, malice, substantial step, or premeditation, all required for the crime of attempted 1st degree murder, and aggravated assault. Officer Wenberg was never in any danger of actual harm, much less being shot.

3.  Officer Wenberg testified that he brushed a hard object out of petitioner's left hand. Common sense dictates that if a person intends to use a gun in a malicious and premeditated way then his fingerprints must be on the weapon handle, and his finger must be prominently on the trigger leaving an indelible fingerprint or forensic signature. Moreover, if petitioner had in fact intended to use the weapon in a malicious and premeditated way then petitioner would have had to make a conscious decision to utilize his dominant right hand, but Officer Wenberg testified that the unknown object he allegedly forced out was in petitioner's non-dominant left hand. No evidence was presented that the gun was pointed at officer Wenberg, or anyone else. The evidence, testimony of Sgt Trimble, showed the gun was not "pointed" at officer Wenberg or anyone else. No evidence was presented that petitioner was in "control" of the gun. In order for a gun to be fired a finger must be on the trigger. Obviously, that is not the case or the weapon would have abruptly discharged when it was allegedly forced out of petitioner's non-dominant left hand.

4. The State's weapon expert Officer James Wetzel testified: "that any ordinary adult male or female of ordinary strength and ability would be able to pull that trigger with the dominant or non-dominant hand." (Not once but twice told the jury this). He furthered this testimony by stating "Yes. A child would be able to pull back – have sufficient strength to pull back a double action trigger". (T.T. pg. 701-702).

     **Defense asked**: "Now if someone had their finger on that trigger and its ready to discharge and if someone is wrestling around, would it be easy to pull that trigger?"

     **Officer Wetzel**: "Yes".

     **Defense**: "So it's fair to say that if you have the weapon, you're wrestling around, you're not paying attention to it, and you're finger is on that trigger, it would most likely go off; is that fair to say?"

     **Officer Wetzel**: "That's fair to say."

     **Defense**: "In fact accidents do happen with these weapons; isn't that true?"

     **Officer Wetzel**: "Yes."

5. The State alleged that petitioner had control of the weapon and had a malicious and premeditated intent to harm Officer Wenberg. However, based on Officer Wetzel's testimony if two people were wrestling around with a hair trigger weapon, it would have [irrefutably] discharged. Officer Wenberg claimed that he *forced* the gun out and away from petitioner's hand and body. Common sense dictates that this sudden motion should have caused the weapon to discharge. In fact, if there was the requisite intent to harm or kill would have required control of the gun a finger in the proper position to fire the weapon. The evidence appears indisputable that if the unknown object that was allegedly *forced* out of Petitioner's non-dominant hand was a gun, and there was malicious intent to use this gun his finger **must** be prominently on the trigger, and any sudden motion forcing the alleged gun down and away out of petitioner's hand, would have certainly discharged the weapon. No such discharge of the weapon occurred. Simply stated, two people were wrestling around, in a sudden and extremely confrontational manner and the dangerous hair trigger weapon never discharged.

6.  Additionally, it allegedly took four or five veteran officers and the use of a Tazer/Stun gun to subdue petitioner and get his arms behind his back to hand cuff. Had there been intent, and malice, the weapon would have certainly been in petitioner's hand when

Officer Wenberg claimed to suddenly and aggressively knock the weapon down and away in the specific direction it would take to discharged the weapon. If the mistake of having a finger on the trigger was present when the gun was allegedly knocked loose from petitioner's clumsy non-dominant hand, the weapon undoubtedly would have discharged. This was when officer Wenberg aggressively drug petitioner out of the vehicle.

      (T.T. pg, 716-717)

 During cross-examination of the State's weapon expert:

**Defense Counsel**: "Now how easy is it to move that safety?"

**Officer Wetzel**: "It's fairly easy to move the Safety. There is a clicking motion there. I mean it takes effort, if you will, to manipulate it and move it. It's not going to move on its own."

**Defense Counsel**: "Now, if the gun would be – for example, again, if the gun were to fall on a hard object of some sort, could that safety be moved?"

**Officer Wetzel**: "Not likely."

7. However Officer Wetzel admits right after that that yes "specific force" can easily move the safety. That it is not "completely impossible" for the guns safety to move when dropped on a hard object if it landed in a specific way. This is exactly the way the pictures law enforcement took of the weapon show it landed. The handle was down inside the cup holder with the safety or decocking lever against the hard lip of the cup holder. This must have been how the safety lever got knocked into the firing position. (T.T. pg 717-719)

8. Sgt. Trimble is the only officer to testify he saw the gun in petitioner's hand. Yet, Sgt. Trimble opted to ignore the deadly weapon he says he saw, and did not secure the gun, instead, he knowingly left the weapon in the control of the driver, unattended. He did this in disregard for his own life, the lives of the officers, and others he knew were present. This total disregard for life and safety is highly unbelievable.

9. Sgt. Trimble testified he ran around the vehicle to assist four (4) veteran officers with handcuffing petitioner. Sgt. Trimble is a veteran police officer, and the on duty shift supervisor, yet, he ignores his extensive police training and abandons the gun, to assist four (4) highly trained and very capable police officers arrest petitioner. The alleged

immediate threat to the seven or eight lives was the weapon, which Sgt. Trimble makes a conscious decision to leave in the vehicle with a suspect. This is all highly unlikely, but it was his actions that day.

10. Ironically, in a preliminary hearing, officer Wenberg testified in, Sgt. Trimble, and Officer Lionheart, was not even at the SUV, and did not help subdue petitioner. One would think Sgt. Trimble's presence would have been definitive given the alleged involvement and the pointing of his service weapon inside the vehicle in the direction of Officer Wenberg and petitioner. Nonetheless, Officer Wenberg testified to only "Officer Maton, Agent Wetzel, and Officer Reinhart" being present at the SUV for the arrest. Officer Wenberg's testimony would have been more accurate closer to the date of the event. However, Officer Wenberg's testimony is inconsistent from hearing to hearing. Officer Wenberg demonstrated in his testimony that he was willing to commit perjury to assist the State in obtaining this win. (Preliminary Hearing, March14th, 2006, Docket No. Cr-2006-0570, page 8).

11. Facts presented demonstrate, Sgt. Trimble never yelled "gun" or declared at the scene to see the weapon. Coincidently, upon arrival, Officer Reinhart testified that he never heard Sgt. Trimble declare that had in fact seen a weapon. Sgt. Trimble does testify that he had his duty weapon drawn and pointed directly at petitioner. But, if this alleged danger was in fact true and manifested, Sgt. Trimble would have most certainly eliminated the threat to himself and the other officers by shooting petitioner and he would have been duly justified in doing so.

12. More importantly, at the time of arrest, the State and Police that were involved failed to find any probable cause to charge petitioner with Aggravated Assault or Attempted First Degree Murder. The first charging information that stemmed from March 3rd supports this fact.

13. On March 3rd Sgt. Trimble's actions are self evident: he didn't feel threatened, he never actually saw the gun, and he behaved accordingly. This clearly explains why Sgt. Trimble did not yell "GUN", when he saw it. It also explains why the other officers involved stated he never declared "gun", to them either. This would explain why Officer Wenberg did not recall Sgt. Trimble's pointing of his service weapon, exemplary help, or presence

at the scene. Sgt. Trimble's inculpatory version of events were not known or even needed until after the dubious phone call made eighteen days later.

14. The statement utilized to charge and convict the petitioner stated "I was trying to get my gun cocked to blow the teeth out the back of his fucking head, but I didn't get a chance to do that." There are several problems with this statement and the States gun expert explained this. He testified that the weapon needed no cocking, and that it takes two (2) hands to cock this weapon. Petitioner kept one hand in complete view at all times. That this weapon was "Double Action", meaning it needed no actual cocking. Only the pulling of the trigger, or sudden motion down and away from the person holding the weapon. Clearly, this statement was an attempt to sound cool and tough to the people he was associated with at that time. Petitioner stated right before this that he had tossed the gun into the console which clearly makes more sense due to the physical and actual evidence.

15. The intent, malice, and premeditation elements cannot be formed from inference stacked on inference of words taken out of context eighteen days after the alleged crimes. Willfulness, malice, and premeditation must therefore be present and proven by relevant evidence exclusively apart from the erratic behavior manifested on the Natrona County Jail telephones. The State did not prove Petitioner had planned, thought-out, or even tried to follow through with the alleged attempted murder and aggravated assault.

16. Petitioner's conduct indicates that he had clearly distanced himself from the weapon to avoid the potential felon in possession of a firearm, and petitioner did so prior to the approach of law-enforcement. Petitioner stated in the same March 18th phone call that he had "tossed the gun into the console" of the SUV, and not wanting to sound like he was weak to his peers, he made up the rest of the erratic statement. In trial, petitioner's counsel moved to have the statements excluded that showed Petitioner got rid of the gun because he could potentially face twenty to thirty years in federal Court. That he needed to get out of jail before that happened.

17. The conviction of attempted murder in the first degree, aggravated assault, and possession of a weapon with unlawful intent must be reversed and relief granted. Not only is there insufficient evidence and a miscarriage of justice, these charges are duplicitous.

18. A charge is duplicitous if it joins two or more offences in the same count. *United States v. Trammell,* 133 F.3d 1343, 1354 (10th Cir. 1998). There are three dangers that could result from a duplicitous indictment "(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy offense; (3) A Court may have difficulty determining the admissibility of evidence." Id. (quoting *United States v. Wiles* 102 F.3d 1043,1061 (10th Cir. 1996)).

19. Petitioner's Appellate and Trial counsel are ineffective for failure to competently investigate, raise prosecutorial misconduct, raise judicial discretion and protect petitioners right under the United State and Wyoming Constitutions.

The public defender's third issue that was presented to the Wyoming Supreme Court is in the appendix labeled direct appeal:

III.     Whether the district court erred when it denied Petitioner's motion to suppress evidence seized after an illegal stop.

Petitioner stated the following in his Amended Petition for Post-Conviction Relief this issue was raised to the Wyoming Supreme Court on direct appeal therefore is fully exhausted and this Court has jurisdiction to address;

#18     Both, the Supreme Court, and the District Court relied on the false facts and perjury to support their rulings. Below is factual in the record proof of such violation. Appellate counsel is ineffective for failing to raise these specific facts and argue the additional protections afforded by the Wyoming Constitution Art.1, 4, in violation of the United States Constitution.

1. Appellant counsel was ineffective for the failure to raise this issue under the sovereign protection provided by the Wyoming constitution. The Wyoming Supreme Court in its mandate failed to reverse the District Court's erroneous ruling that denied petitioners motion to suppress. Both the Wyoming Supreme Court and the District Court relied on false facts and perjury to support their rulings and abused discretion when they violated

petitioner's Federal and State Constitutional rights. The State suborned perjury from Officer Wenberg and committed Prosecutorial Misconduct.

2. The Wyoming Constitution states; The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized. Wyo. Const. art. 1, 4 constitutes a separate and independent source of protection of the rights of Wyoming citizens. The Wyoming Constitution provides protection of individual rights separate and independent from the protection afforded by the United States Constitution. (See *Pierce v. State, 2007 WY 182 (WYO2007).*

3. In *Cohen v. State,* 2008 WY 78, on paragraph (¶26), the Wyoming Supreme Court discusses the following misstated facts:

P26 "After reviewing the record on this case, we have no trouble concluding that officer Wenberg possessed reasonable suspicion justifying the investigatory stop of the SUV. The record discloses the following facts:"

(1) "Officer Wenberg had been following the events over his police radio and knew there was a warrant out for Cohen's arrest;" Officer Wenberg admitted he had no idea who the man was that crossed the street and he admitted this in preliminary hearing and trial. In fact officer Wenberg called in the investigatory stop as a normal casual traffic stop like it was going to be fruitless. Officer Wenberg then approached the SUV alone, in the normal traffic stop manner, and not the stop of a wanted known felon who had just led police on a chase and possibly injured a DCI Agent in the process. More importantly, the alleged bullet proof vest had been found in the Camaro and the possibility of a weapon was reported to be potentially an issue. Officer Wenberg also testified that the flier stated that Mr. Cohen liked guns and weapons. Mr. Wenberg own actions clearly demonstrated he possessed no articulable facts which support he actually suspected Petitioner of being who the police were looking for. Officer Wenberg never would have approached the SUV alone, without his weapon drawn, knowing that the person he was looking for liked guns, weapons, and could be in possession of body armor. The record supports that

Officer Wenberg has committed perjury on several occasions and his testimony must be impeached and his credibility impugned.

(2) "Cohen was reported to be on foot in the area where the grid search was being conducted;" But, Petitioner was located twenty minutes after the suspect was lost, and looked nothing like the confirmed reports and radio traffic that gave the definitive physical description of the gray shirt, and bald head. Petitioner was seen wearing a red sweat shirt and had on a baseball cap. Notably, the grid search Officer Wenberg claimed to be conducting was even in the wrong direction of the reported flight that the driver was supposed to be running in. (REFER TO RADIO LOGS. Pg2-3)

(3) "The radio reports indicated that Cohen ran west in the direction of McKinley Street after abandoning the Camaro;" Officer Wenberg testified that the radio reports indicated that Cohen ran WEST in the direction of McKinley street after abandoning the Camaro. However, information from fellow officers including radio traffic stated petitioner ran **south,** *west* **was NEVER** stated. Officer Wenberg committed perjury when he stated radio traffic said suspect ran "**west**" the direction that Petitioner was seen crossing the street, and officer Wenberg may have done so to show reasonable suspicion that he obviously never had.(M.H., pg. 10). Clear and convincing evidence in support of this is the indisputable police radio log which clearly states several times **suspect ran south,** the direction of west is never factually stated. Notably, in the Motion to Suppress hearing, Officer Wenberg was asked to read directly from the radio logs, he still chose to lie. (Radio log pg.,2-3).

(4) "Officer Wenberg saw a man cross McKinley street heading west about twenty minutes after Cohen abandoned the Camaro;" The information Mr. Wenberg had at the time was clearly south not west, again, refer to the indisputable police radio log. Furthermore, twenty minutes had passed and a great deal of distance can be covered in twenty minutes time, even the slowest of walkers can cover over a mile of in that amount of time. The suspect was last seen running south, therefore the reasonable direction and distance would be much greater then one block, west. Running a person can easily cover the

distance of a block in about thirty seconds. Officer Wenberg never stated that Petitioner looked suspicious or even out of breath from the reported running of the suspect, therefore reasonable suspicion was never present.

(5) "The male suspect was sighted just a block away from the Camaro;" However, this was twenty minutes at lunch break (12:20-12:45) in the day time, and this block away, was in residential housing. Officer Wenberg testified that Cohen came from between two houses. More importantly, Petitioner was not even close to the clear description given by police over police radio, therefore this block away is nothing more then coincidence. In the twenty minutes that had passed the suspect could be anywhere.

(6) "Officer Wenberg saw the suspect coming out from between two houses, not exiting a residence or other structure;" However, testimony from Doral Waddy stated petitioner was in her enclosed porch, used her phone to call for a ride. Mr. Virgillio's cell phone records and call history confirm Mrs. Waddy's testimony. Police testimony supports petitioner called Mr. Virgillio from Mrs. Waddy's house. Again Officer Wenberg committed perjury in the Motion to Suppress Hearing to show reasonable suspicion, which was not present. The phone history the police looked into on Mr. Virgillio phone showed petitioner called Mr. Virgillio. Testimony shows petitioner was obviously inside the home where the call was placed from. Mrs. Waddy's home is set back a little from the two houses, but is there. Officer Wenberg made it sound as if Petitioner came out of the bushes between the two houses which is not true. Again, Officer Wenberg commits perjury to further the states case at every available opportunity.

(7) "The officer knew from experience that this neighborhood had very little pedestrian traffic;" However on this particular day, several people were in the area, that there is indisputable evidence that police spoke with them, refer to the radio logs. Specifically, but not only, Daryl Smith, who was a match to the physical description and was known by the police to carry weapons and items like the fragmentation vest that was found inside the vehicle that was parked right in front of his home. Again the Camaro was parked in front of Daryl Smith's house. The radio logs show this information was readily

available to Officer Wenberg. It is rather apparent that officer Wenberg again committed perjury concerning the facts of march 3[rd,] 2006, he did so to show probable cause, and reasonable suspicion that he never had.

(8) "Officer Wenberg was somewhat familiar with Cohen's physical appearance from his participation in a drug investigation involving Cohen a few months earlier;" Officer Wenberg testified in trial, **he did not know the person who crossed the street and climbed inside the passenger side of the SUV.** He further admitted that he was not even sure Petitioner was in fact Mr. Cohen until he was able to match tattoos at the county jail. (Enclosed is the surveillance picture Officer Wenberg alleged to have take several months earlier. Notably, the face in this picture he took is unidentifiable). If Officer Wenberg actually suspected that petitioner was who he alleged to be familiar with and could have been who he and the police were looking for; 1) he would not have approached the vehicle alone without back up, and he would have ordered the occupants to exit the vehicle at gun point given all the available information and the heightened awareness, 2) Officer Wenberg, would not have put himself in unnecessary harms way, 3) he would have followed police proto call, and his almost twenty years of experience and police training, and would havw called the stop in for what it was, a suspect located stop, not a traffic stop. (M.H., pg., 16).

(9) "The suspect was the "right size and shape" of Cohen, although his clothing was a little different from the description transmitted earlier over the radio for Cohen;" Petitioner points out that the "size and shape" the officer was going off of, was wrong, the description of 5'10", white male approximately 160lbs. This was not only wrong, but fits most of the male population in Casper, and even Wyoming. Petitioner was 185-190lbs when arrested 25-30 lbs is a considerable difference. The clothing reported was drastically different, and not even close to the description given over the police radio, a bright red, or orange sweat shirt is totally different from the grey sweatshirt reported by police over the police radio. Furthermore, police radio traffic was suspect was bald, however, petitioner was wearing a base ball cap when he crossed the street and the officer (Wenberg) was unable to see if petitioner had hair or not. Therefore, reasonable suspicion

was not there, or probable cause. Not only was this right "size and shape" perjury, it was utilized to show suspicion that was never present.

(10) "The suspect matched the physical description of Cohen contained in a flier posted at the police station;" First the flier at the police station did not have a picture on it, it only gave a vague physical description, and this is the white male, 5'10", 160lbs, and balding. Notably, petitioner weighed 190lbs when arrested on March 3rd, 2006. The record contains no evidence if the age was listed on the flier or facial hair. A good portion of the male population fits this range of 5'10", 160lbs. This physical description was not only wrong, but without being able to point to something specific, the officer acted on a hunch and committed perjury to further the states case and justify his illegal actions. His actions speak louder then his words, if he truly suspected petitioner was who he was looking for he would have initially notified dispatch of his find. Information the officer had was that the suspect had already injured one officer (Agent Norcross), and had just drove past him aggressively making him concerned for his own safety. Officer Wenberg would not ignore police procedure and recklessly place himself in harms way and unnecessary danger. Moreover, this alleged flier was never produced to show Officer Wenberg was in fact telling the truth. Officer Wenberg admitted he did not even know what Petitioner looked like even though he allegedly had taken a surveillance picture of Mr. Cohen. (M.H. pg, 31).

(11) "Officer Wenberg observed the suspect enter the passenger door of the waiting SUV;" Mr. Wenberg admitted that the waiting SUV with its brake lights on did not trigger any suspicions, (this was at lunch time and people wait at the side of the road in residential areas). Officer Wenberg clearly admits he had never seen this person before that crossed the street and had no idea if the man he seen crossing the street was in fact Mr. Cohen, whom the police were allegedly looking for. Again, the direction, and description that was given over the police radio was totally different. The information in the flier was vague, with no picture, and significantly different then the actual physical traits of the man Mr. Wenberg observed get into the SUV. Twenty five to thirty pounds is very significant, especially since Mr. Wenberg claimed in the Motion to Suppress hearing he

was acquainted with Mr. Cohen and knew exactly what he looked like. But, Wenberg admitted he had no idea who the man was that crossed the street that day.

4. Under the circumstances, it is rather clear Officer Wenberg was acting on nothing more than a simple "hunch" or guess, when he stopped the SUV. The totality of these factors, along with rationale inferences, does not support a reasonable suspicion that Cohen, the person police were searching for, was in fact the passenger in the SUV.

5. *In order to establish the reasonable suspicion necessary to justify a . . . Terry or investigatory stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences [drawn] from those facts, reasonably warrant that intrusion." Olson v. State, 698 P.2d 107,109 (Wyo.1985) (quoting Terry v. Ohio, 392 U.S. @ 21, 88 S. Ct. @ 1880). Wilson v. State, 874 P.2d @ 220.*

6. Officer Wenberg, did not, and was not able to point to any specific and articulable facts which, taken together with rational inferences [drawn] from those facts, reasonably warrant that intrusion. The Wyoming Supreme Court found articulable facts the police officer did not point out which is the requirement of *Terry,* Id.

7. However, Officer Wenberg was able to point to a <u>feeling</u> he had. Officer Wenberg admits in the preliminary hearing that "I don't know if this is the suspect that were looking for or not, I'm not sure, but I felt it was worth a look see". (P.H. CR-2006-0570, pg 6, March 14th, 2006). Officer Wenberg's own testimony in the preliminary hearing supports that he **"felt** it was worth a look see" and a feeling is acting on a "hunch". His admission testimony showed he was unsure of petitioner's identity. There is the man he took a surveillance picture of, but officer Wenberg had no idea if petitioner was in fact that same man that police were looking for. Again, Officer Wenberg committed perjury in the motion hearing to show reasonable suspicion that was never present. Officer Wenberg never did, and could not point out any specific facts that would give a reasonable person suspicion that the man he seen crossing the street at lunch time, not even close to the clear description given, was in the commission of, or has committed any crime or was the person that police were looking for. Officer Wenberg did admit petitioner was not wearing the same clothing as earlier broadcast over the police radio, and was different from the description the other officers gave him. Officer Wenberg had no idea if

petitioner was bald, or not. Admittedly, he also had no idea if the man he seen crossing the street was the same person he took a photograph of just a few months earlier. This coupled with the facts discussed above clearly show that Officer Wenberg had no reasonable suspicion and that any reasonable view of the factual evidence must come to the conclusion that Officer Wenberg committed perjury and acted on nothing more than a "hunch".

8. Clearly the Wyoming Supreme Court errored and abused its discretion when it failed to reverse the District Court. The District Court abused it discretion when it denied the motion to suppress, and did so based on perjury and false facts used to show reasonable suspicion. *Wilson v. State, Id*

9. "Factual Findings made by a trail court considering a motion to suppress will not be disturbed unless the findings are clearly erroneous. *Meek v. State,* 2002 WY 1, 37 P.3d 1279,p8 (Wyo. 2002). Because the trail court has the opportunity to hear evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions, we view the evidence in the light most favorable to the trail court's determination. Id. Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law and is reviewed de novo." *Vasquez v. State,* 990 P.2d 476, 480 (Wyo. 1999).

10. Officer Wenberg was not justified in opening the vehicle door and aggressively placing his hands on and assaulting petitioner. Officer Wenberg needed probable cause to open the SUV door. Testimony clearly supports that petitioner was totally cooperative, compliant and kept all hands in full view until officer Wenberg became aggressive and opened the SUV door and placed his hands on petitioner. Petitioner never moved his hands out of his lap until after the officer physically forced himself on and assaulted petitioner. Officer Wenberg did not have probable cause at the time he opened the SUV door. Plus Officer Wenberg admitted he had no idea who the man was that crossed the street and was sitting in the passenger seat of the SUV. Although he alleged to be familiar with Cohen, however he admits that he was not sure until he was able to match up tattoos at the county jail. The seizure and arrest of Cohen by Officer Wenberg was illegal and a direct violation of the Wyoming and United States Constitutions.

11. The search of the Camaro was illegal. There was a camouflage fragmentation vest seen in the Camaro. There are no laws that forbid the ownership, protection, and use of these items. There was no arrest made out of the Camaro therefore no search incident to arrest. The vest was not in use and therefore not a threat. There was no actual evidence that this vehicle possessed illegal contraband, there was nothing in plain view or sight that was illegal. The state falsely assumed that there is probable cause to obtain a warrant due to the mere presence of a camouflage vest. Notably, the vehicle was parked in front of a home and no person was arrested out of the vehicle. Without something that was illegal in plain-view the police did not have probable cause to obtain a warrant to search the Camaro.

12. Appellate counsel is ineffective for failure to investigate and fully incorporate the facts stated herein. Petitioner's constitutional rights have been violated and the conviction must be reversed in the interest of justice.

13. The following issues were presented to the District Court in post-conviction then the Wyoming Supreme Court in the Writ of Review, and now a second opportunity has been given, in the order they were presented. This issue has clearly been exhausted and the state courts fail to fix, or address the mistakes that the state made to uphold the illegal stop and conviction of petitioner.


#1 **Appellate counsel failed to raise impermissible 404(b) evidence on direct appeal and trail counsel's ineffectiveness for failing to have the prejudicial 404(b) telephone calls excluded.**


1. The Wyoming Supreme Court has reiterated that the purpose of 404(b) evidence is to avoid a demand that an accused defend acts of misconduct other than those charged in the indictment or information and to avoid potential confusion by members of the jury in addressing the issues of the case. The rule demands convictions are to be founded in those facts relevant to the crime or crimes charged. If the thrust of the evidence of prior bad acts evidence is only to demonstrate the defendant has a disposition to commit crimes the evidence should be excluded. *Johnson v. State*, 936 P.2d 458 (Wyo.97), and *Simmons V. State*, 2003 WY 84, (Wyo. 2003). Moreover, a criminal defendant "should not be

convicted because he is an unsavory person, nor because of past misdeeds, but only because of his guilt of **the particular crime charged**." *Leyva v. State*, 2007 WY 136, (Wyo. 2007). ·

2. The State charged and convicted Petitioner with attempted first degree murder and aggravated assault based entirely on telephone calls placed from the Natrona county jail. However, Petitioner was initially arrested for misdemeanors, to wit, resisting arrest and reckless endangerment on March 3rd, 2006. The state introduced the calls that were placed from the jail {after} this arrest for misdemeanors. During the course of a couple weeks, and the alleged inculpatory phone calls, the initial misdemeanors elevated into violent felonies, to wit, attempted 1st degree murder, aggravated assault. Defense Counsel lackadaisically objected to the erratic phone calls being introduced at trial, but, not unsurprisingly, the state paraded out all aspects of the telephone calls that were overtly prejudicial. Petitioner contends that the laundry list of aspects and not a specific purpose is a prejudice that cannot be overlooked or even overcome. *Daniel v. State*, 189 P.3d 859, (Wyo. 2008)(T.T. 358-364).

3. Petitioner was on trial for the alleged crimes of Attempted First Degree Murder and Aggravated Assault. He was not on trial for being an unsavory character and the usage of profanity. He was not on trial for his contradicting knowledge concerning the drug trade. He was not on trial for trying to secure bond and gain release out of jail. He was not on trial for the implied infidelities with a female friend Mrs. Katie Gendron. The State did put petitioner on trial for posturing over the jailhouse phone. The State exceeded its ethical bounds by implying that petitioner was a known drug dealer, he was unfaithful to his wife and family, and a total menace to the community. Unchallenged the state was able to take petitioner's mentally unstable induced statements, and use them as factual and creditably documented character evidence to confuse, mislead, and inflame the jury. *(Wild v. State,*2003 WY 93, *Vigil v. State,* 926 P2d *351, United States V. Commanche*, 577 F3d 1261 (10th Cir 2009).

4. Petitioner was instructed by the public defender Ms. Collier to not testify. The Court was duly notified of the decision and correctly and explicitly stated that prior convictions were not to be introduced. Nevertheless, during voir dire, the public defender told the jury that there were prior convictions of the same type as the alleged to be on trial for that

day. She also stated that petitioner was not likable, that he was vulgar, mean and profane. Mrs. Collier irrefutably predisposed the jury to perceive the defendant as having a propensity to be involved in illegal activity. Mrs. Collier attended the 404(b) Hearing in which the Court clearly stated that prior convictions were not to be introduced, but this direction went unheeded due to Mrs. Collier's obvious inexperience. Petitioner was on trial for an array of serious felonies but, as the record reflects, the public defender was blind-sided and compelled into an arena she was utterly unprepared to defend in.

5. "Arguments which are calculated to appeal to the jury's prejudice or passion are improper because they pose a risk that the accused may be convicted for reasons wholly irrelevant to his guilt or innocence. Accordingly, it is improper to encourage the jury to convict a defendant in order to protect the community rather than upon the evidence presented at trial. In *Gayler v. State*, 957 P.2d 855, 861 Wyo. 1998), we restated this precept in a drug delivery case. *Burton*, 2002 WY 71, p15, 46 P.3d at 314 (internal citations omitted)."

6. "It is well settled law that tape recordings are admissible in a criminal trial if they accurately reproduce the conversations that took place and they are accurate, authentic, and trustworthy. Once recordings are admitted, a defendant can seek to impeach them by showing that the voice on the tape is not his, that the tapes are untrustworthy or contradictory. *United States v. Billy Mac Thompson*, 130 F.3d 676, (5th cir 1997)."

    1. Petitioner disputes the states injurious utilization of the phone calls. These calls were made after the incident and while petitioner was suffering through detoxification. Notably, the state used these calls to enhance misdemeanors, to felonies and did so with untrustworthy, inaccurate erratic statements. Not only was the state able to fraudulently enhance the misdemeanor charges but, went straight to the most extreme of potential punishments.

    2. The call or calls do not recount the entire event or any of the events. More importantly the calls were taken out of context. The so-called inculpatory telephone calls had absolutely no relevance to the alleged crimes of March 3rd, 2006.

    3. Every call was impermissibly altered to benefit the state. Only inculpatory portions or "snippets" were played for the jury. Had the call been played in its entirety, the jury would have been fully informed of his exclusive intent to post bail. This

completely changed the context of the phone calls that were placed from jail. (T.T. pg,362,371,744).

4. Petitioner contradicts himself in every call. His actions were erratic and he was saying all sorts of different things to different people in an effort to secure bond. All of the calls played for the jury are untrustworthy, contradictory and should have been excluded as irrelevant evidence. The state never laid foundation as to the truthfulness of the calls. Had the public defender been effective, she would have raised this concern, and not prejudiced the petitioner with his calls made claiming all sorts of stuff to gain bail from jail, and be accepted by his peers.

7. The district court ruled in the 404(b) hearing that prior convictions were not to be allowed before the jury, and yet, during voir dire, petitioner's trial counsel impermissibly and against the court ruling, informed the jury that petitioner was recently convicted of charges that are similar and the same type of what he was on trial for. This patently prejudiced the jury panel with previous convictions that were clearly in violation of the courts 404(b) ruling. Without petitioner taking the stand to give the jury full and complete disclosure in this, was a grave mistake made by trial counsel.

8. The exclusive character evidence the state introduced were the telephone calls which compelled the jury to disregard the relevant facts. The state strenuously implied and continuously stated petitioner was a prolific drug dealer in the community by utilizing the snippets of phone calls. But again this was irrelevant to the actual crimes that stemmed from March 3rd, 2006. This exposure to highly prejudicial, irrelevant, and inflammatory evidence aroused the prejudices of the jury to protect the community against an alleged societal evil. None were proven to be true with factual evidence. This is clearly in contradiction to *Strange v. State*, 2008 WY 132, (Wyo. 2008).

9. The public defender was fully aware of the deleterious consequences of the telephone calls. Nevertheless, she egregiously and unprofessionally failed to file a Motion in Limine to contest the injurious and imminent effect the calls would have on the jury. Petitioner was unequivocally denied his constitutional right; Moreover the Tenth Circuit District Court has held that irrelevant recordings must be excluded and only offered for

probative factors. *United States v. Allums,* 2009 U.S. Dist. LEXIS 31334 (D. Utah, Apr. 9, 2009).

10. A large portion of the state's presented case against the petitioner relied upon the use of what should be perceived as illegally obtained evidence; and evidence that was improper due to lack of competency, and comprehension, was in the form of phone calls, by petitioner to his wife while under the influence of methamphetamine, and recorded by jail personnel on the only telephone that petitioner was allowed to use.

11. At no time during trial, or before did the state present evidence of a court's order permitting them to monitor and record petitioner's protected conversations via the jail telephone. Nor was any presented during the post-conviction case and appeal.

12. Petitioner in order to communicate with his wife or attorney (potential or acting) had to use the jail telephone while he was suffering from the effects of detoxification from being forcefully taken off methamphetamine and other illicit drugs. See immediately following incorporated herein in fall and is made part here of.

13. It is without question that petitioner has an expectation to, and a right to be free of intrusion into his protected right to communicate with his wife or his attorney; moreover, that right should not be abused to the extent that it is recorded and then used to convict him.

14. It is further without question that prosecutors, police, and jailers (police, often) work together to obtain leads to evidence and evidence to use against an arrested and held pretrial detainee.

15. And, it is also without question that the jailers offer *only* phone service to criminal defendants that is under exclusive control and applies equally to the recording on non-privileged and privileged conversations, to be used to aide in or conduct investigations, and to be ultimately used in prosecutions.

16. Trial and appellate counsel were ineffective in their failures to remove the offensive phone conversations, and the investigation into or presentation of evidence of petitioners' mental status from methamphetamine detoxification.

17. It has long been determined that in trial sense, drugs can inhibit or prevent a criminal defendant from participating in his own defense, i.e. exercising his right to participate in his own defense. A hearing to determine the defendants capability to participate in his

own defense is generally required. The same standard should apply to a defendant who being forcibly cut off from his daily intake of methamphetamine and undergoing detoxification should have had a proper hearing, ibid., and in some applications, a retrospective hearing. Whether viewed as a "confession" or "admission/ statement against interest", due to Petitioner's heavy drug use and resultant detoxification symptoms, he should have been given a hearing to make a reliable determination on the voluntariness issue. And it is a legal question requiring independent consideration in a federal habeas corpus proceeding. This aspect of "capacity", "voluntariness", ect, is not new.

18. The best argument would possibly be that trial counsel failed to secure any of petitioners' rights, including but not exclusive, the Fourth Amendment right against unlawful seizures; Sixth Amendment right to participate in his own defense, and to effective assistance of counsel; to right to protected spousal and counsel communications; and the same violations of effective assistance of counsel on appeal for also not securing, or recognizing the need for, petitioners' rights.

19. Trial counsel was ineffective for defying the explicit order of not introducing the fact that petitioner was a convicted felon, prohibiting petitioner to take the stand in his own defense, and failure to file a motion in limine. Appellants Counsel's failure to raise this issue on direct appeal is clear evidence of ineffective assistance counsel in violation of the United States Constitution and the Wyoming Constitution. Therefore, petitioner request his convictions be reversed and granted a new trial, which is based on relevant, reliable, truthful, and noncontradicting evidence of an actual crime.

**#2 Appellate Counsel is ineffective for failing to raise trial counsel's ineffectiveness on direct appeal. Trial Counsel is ineffective for failing to investigate Petitioners methamphetamine detoxification and prominent mental disorders and chemical imbalances that compelled the injurious phone calls.**

1. The United States Supreme Court has outlined trial counsels duty to investigate as follows: Strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or make a reasonable

decision that makes particular investigations unnecessary. The reasonable of counsel's actions may be determined or substantially influenced by the defendants own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. What investigations decisions are reasonable depends critically on such information. *Strickland v. Washington*, 104 S. Ct. at 2066.

2. As previously stated petitioner was initially arrested for five misdemeanors, and three felonies when placed in the Natrona County Jail. The only violent felony was dismissed by the Circuit Court for lack of probable cause. Subsequently, he tried to post bail on the remaining charges, and in the process made numerous ill-advised and erratic phone calls that were recorded by the state. However, the state had no warrant and the security of the facility was never an issue, yet, the state utilized the privileged calls for the illicit purpose of elevating and fabricating violent crimes that were never actually committed.

3. Prior to arrest petitioner has been medically diagnosed with Bi-polar Disorder, Attention Deficit Disorder, Attention Deficit Hyperactivity Disorder, Substance Abuse Disorder, Chronic Depression, and Adjustment disorder, and was manifestly detoxing from the use of methamphetamine, alcohol, and other elicit substances. The detoxification from these substances coupled with petitioner's documented psychiatric problems obviously invoked behavior that was erratic and aggressive. Petitioner had an uncontrollable need to be accepted and loved by people in his life.

4. An expert in methamphetamine abuse treatment, Dr. David McDowell, concluded that after using methamphetamine, the addict crashes which can cause feelings of depression and suicide. Even after discontinuing methamphetamine use addicts can have continuous psychotic symptoms that persist for months and even years. In fact, the prolonged use of crystal methamphetamine can irreparably damage the brains receptors. This brain damage, which consists of dried up receptors and faulty pathways for the brains thoughts can cause severe behavioral problems such as: paranoia, decreased social skills, delusions, depression, malnutrition, violence, aggression, permanent psychological problems, kidney and lung disorders, liver damage, hallucinations, and feelings of suicide.

5. Dr. McDowell further noted that "the timing and intensity of the rush are a result of the high levels of dopamine in the brain. Methods that methamphetamine to pass into the brain more quickly are from smoking or injecting and promote more reinforcing and more addiction." There are several serious physical and psychological risk involved when using (crystal) methamphetamine including; increased blood pressure, rapid heart rate, inflammation of the lining, damage to small blood vessels in the brain  which can lead to stroke, episodes of violent behavior, anxiety, paranoia, insomnia, and confusion. (Dr. David McDowell M.D. is the medical director of the Substance Treatment and Research Service at Columbia University at the New York State Psychiatric Institute).

6. The symptoms of adjustment disorder is a feeling of hopelessness, sadness, anxiety, severe mood swings, need for acceptance, posturing, overly intense in their response to stress, depression, an overbearing willingness to be insincere, and untruthful nature, to receive the acceptance of people around them. In addition to these psychological problems there is numerous physical symptoms as well, which include but not limited to, headaches, stomachaches, palpitations, withdrawal or isolation from people and social activities, dangerous or destructive behavior, such as fighting, reckless driving, vandalism, intense fatigue and possible suicide.

7. Bi-polar disorder has the primary symptoms and are dramatic and unpredictable mood swings. The illness has two (Bi) strongly contrasting phases (polar). 1) Bi-polar mania or hypo-mania, consists of euphoria or irritability, excessive talk, racing thoughts, inflated self-esteem, unusual energy, less need for sleep, impulsiveness, a reckless pursuit for of gratification. 2) Bi-polar is a significant and noticeable condition of depression, low energy levels, apathy, sadness, loneliness, helplessness, guilt, slow speech, fatigue, insomnia, or oversleeping, suicidal thoughts, poor concentration, lack of interest or pleasure in usual or normal activities.

8. Significantly, the methamphetamine detoxification and the methamphetamine withdrawal came after the arrest. Consequently, it would have been impossible for petitioner to commit any such crimes against Officer Wenberg eighteen days after and while incarcerated. This detoxification went on unnoticed and untreated by professionals familiar with detoxification and the behaviors associated with withdrawal. Notably, petitioner had numerous behavioral reports written by the staff at the Natrona County

Jail. Regardless, of the fact that petitioner was detoxing, the state audaciously utilized his erratic and uncontrollable behavior to demand that petitioner be shackled during his trial. Expert Medical testimony would have explained to the jury all the documented medical and mental issues that compelled petitioner to irrationally make phone calls that out of character. Petitioner's behavioral dysfunctions in the hours and days following his arrest are relevant of the methamphetamine withdrawal symptoms and psychological issues that clearly invoked his undiagnosed and untreated behavior.

9. Daniel G. Amen, M.D., is a clinical neuroscientist and behavioral forensic consultant, at 350 Chadbourne road, Fairfield, CA 94585. Telephone No. 707-429-7181. Dr. Amen has tested the brain of numerous methamphetamine users, and ex-users and all have shown some type of temporary, and some permanent brain tissue loss or damage and that the brains of ex-users are rewired due to the extremely high levels of dopamine, and that the dopamine receptors dry up and fail to work properly due to this flood over a period of time.

10. Petitioner has a history of Bi-Polar disorder/Manic depression, ADD/ADHD, adjustment disorder, and substance abuse disorder and has been on a variety of medications. Petitioner has diligently tried to obtain medical records from the beginning of his psychological treatments in California. Including the short term in-house treatment program and the Kaiser Permanente, and Options LH where he was a long-term, in-house patient. Petitioner has been placed on numerous psychological medications prior to and during his incarceration, and has diligently attempted to obtain his psychological records from his medical providers and the prison but has been unsuccessful. If the Court should require, petitioner's father Martin Cohen, who now resides in Heber City, Utah, can be called to testify to the psychological and physical abuse petitioner suffered through as a child and adolescent. Mr. Cohen will also testify to the psychological in house and out patient treatments in California, due to this abuse and psychological disorders. Submitted in his Motion to amend was school records from Carmichael, California that show petitioner was emotionally disturbed, and placed in special education as a child and adolescent for having disabilities. Petitioner has diligently attempted to obtain documented evidence from two of the psychological treatment facilities, but so far diligent efforts have been in vain.

11. The affirmative defense of petitioner's methamphetamine detoxification, withdrawal and his documented psychological problems and learning disabilities clearly demonstrate a serious lack of credibility in regards to the phone calls that were utilized to convict petitioner of violent crimes. If expert analysis testimony been requested and made available prior to trial and a reasonable investigation been undertaken to explain the chemical imbalances associated with methamphetamine detoxification there is a substantial probability that the jury would have put the phone conversations in there appropriate context. This would have explained petitioner's erratic behavior in the phone recordings that were unconstitutionally introduced to the jury. With this information, there is a substantial probability that the verdict would have been in favor of petitioner. This detoxification information was crucial and relevant and should have been available for the jury and the jury and any other potential testimony from an expert witness concerning these psychotic features, including auditory hallucinations, delusions, mood disturbances, and paranoia which can result in homicidal as well as suicidal thoughts. *Keats v. State* ,2005 WY 81, *Asch v. State,*2003 WY 18, *Barkell v. Cruose,* 468 F.3d 684, (10th cir 2006), *Drope v. Mo.,* 420 US 162, 178-83(1975).

12. The states entire case-in-chief relied exclusively on the recorded telephone calls placed from the Natrona Count Jail. However, as clearly stated, petitioner is suffering form several diagnosed psychological disorders including Bi-Polar disorder, Adjustment Disorder, ADD/ADHD disorders, and Substance Abuse disorder. Trial and appellate counsel are ineffective for failing to properly investigate and advocate petitioners mental state and psychological disorders as require by Wyoming Statutes § 7-11-301 et.seq. and Wyoming Rules of Criminal Procedure. Ms. Collier and Ms. Domonkos should have investigated petitioner's mental state, methamphetamine detoxification, and learning disabilities. Armed with this exculpatory information both public defenders should have advocated petitioners manifest condition regarding the telephone calls.

13. Trial counsel was wholly irresponsible and ineffective for failing to advocate petitioner's documented disabilities. More significant was the ignorance of the manifested symptoms of methamphetamine detoxification and withdrawal. This physical and mental process compelled behaviors that were beyond the knowledge or control of petitioner. The paranoia alone invoked an aggressive demeanor that instead of being recognized and

treated, it was utilized to support an array of misconduct reports that promoted petitioner being shackled during trial, utilized to enhance misdemeanors to violent felonies, and ultimately to sentence petitioner to Life Without the Possibility of Parole. Nevertheless, the inexperience of trial counsel was displayed by her inability to duly investigate petitioner's conduct in the Natrona County Jail and specifically his paranoid, erratic and aggressive calls. *Strandlien v. State,* 156 P.3d 986 (Wyo. 2007).

14. "A defense attorney is presumed to be competent to provide the guiding hand that a criminal defendant needs, and the burden rests an the accused to demonstrate a constitutional violation arising from ineffective assistance of counsel; there are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.

15.The presumption that counsel's assistance is essential requires the conclusion that a trial is unfair if the accused is denied counsel at a critical stage of his trial; similarly, if counsel entirely fails to subject the prosecutions case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.

16. There may be circumstances of such magnitude that, although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." See *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, (1984).

17. Appellate and trial counsel failed to subject petitioner's documented learning disabilities and ongoing psychological issues to a meaningful adversarial testing as mandated by *Cronic* as stated above. Therefore, they were both ineffective assistance of counsel and consequently, petitioner's conviction should be reversed and remanded for a new trial.

**#3 Trial counsel was ineffective for failing to investigate petitioner's documented learning disabilities that facilitated the misunderstanding regarding the recording of the injurious telephone calls. Appellate counsel is ineffective for failing to investigate and raise on direct appeal the identical issue.**

1. Petitioner submitted his school records in his Motion to Amend his Petition for post-conviction relief. These records are from the special education department of San Juan Unified School District located in Carmichael, California. These records support petitioner's inability to fully understand his situation and his being emotionally disturbed. These school records show that petitioner's learning and comprehension disabilities kept him from fully understanding that the telephone calls were being recorded and that they could be used in Court against him. Without petitioner consenting or understanding the impact of his telephone calls being recorded, the state should have been prohibited from introducing them in their case-in-chief.

2. Again, petitioner's detoxification from methamphetamine triggered an extreme chemical imbalance. This coupled with petitioner's documented learning disabilities and psychological problems, provides relevant data that organic brain damage is evidenced by prior methamphetamine abuse and detoxification. Petitioner not only failed to fully comprehend and process the distinction between privileged calls and calls to family and friends attempting to secure bond. His ill-advised and erratic telephone calls were being recorded without due consent, but also, he had no cognitive ability or the mental capacity to understand that all of his private, and posturing statements were recorded and were to be impermissibly used as inculpatory evidence to fabricate violent crimes against petitioner.

3. Petitioner attached his school records to support that he was placed in special education due to a history of learning disabilities and continuing emotional, and psychological problems. Trial counsel should have adamantly and professionally requested that petitioner undergo a battery of psychological testing and appropriately investigated the medical symptoms of methamphetamine detoxification and adverse methamphetamine withdrawal.

4. Trial and appellate counsel were ineffective for failing to investigate, recognize, and advocate petitioner's inability to comprehend the dire consequences of using the Natrona County Jail phone. Appellate counsels and trial counsels are ineffective for their collective failure to raise this relevant issue at trial and on direct appeal in violation of the United States Constitution and the Wyoming Constitution. Petitioner's conviction should

be reversed and remanded for a new trial. #2 preceding is adopted and incorporated herein in full.

**#4 Appellate and trial counsels are ineffective for failure to raise and file a motion to suppress spousal privileged communications.**

1. The state, as represented by special agent Tina Trimble, intruded into an area "which there is a constitutionally protected expectation of privacy," *New York v. Class*, 475 U.S. 106, 112, 89 L.Ed. 2d 576, 88 S.Ct. 507(1967)(Harlan J Concurring). Such a "Constitutionally protected reasonable expectation of privacy" exists only if 1) The defendant has an "actual subjective expectation of privacy" in the place searched, and 2) Society is objectively prepared to recognize that expectation. *United States v. Davis*, 932 F.2d 752, 756 (9th Cir 1991).

   1.) At trial the state introduced approximately thirty phone calls of petitioner and his wife which specifically entailed infidelity issues, financial hardships, possible sources of money, monies that were owed, and the possibility of securing bond. The state impermissibly invaded petitioner's privileged calls between his wife and himself. The Tenth Circuit is unrelenting in the spousal privilege of communication and; any communication between husband and wife is spousal privileged communication and is expected to be private. A "Constitutionally protected reasonable expectation of privacy" easily fits, any communication between husband and wife is expected to be private regardless of the topic and subject.

   2.) "Society is objectively prepared to recognize that expectation." Society as a whole has regarded the relationship between husband and wife to be sacred and has historically encouraged confidential communication between spouses. Without confidential communications between husband and wife the ground work and foundation of marriage would fail. *United States v. Jones,* 213 F.3d 1253, 1260b (10th cir. 2000).

   **The State of Wyoming joins this irrevocable determination:**

   a) Wyo. Stat. Ann. § 1-12-104, provides; No husband or wife shall be a witness against the other except in criminal proceedings for a crime committed by one against the

other, or in a civil action or proceeding by one against the other. They may in all civil and criminal cases be witnesses for each other the same as though the marital relation did not exist. "The primary purpose of the confidential marital communication privilege is to foster marital relationships by encouraging confidential communication between spouses. This is the primary purpose the Wyoming legislature intended to further when it enacted Wyo. Stat. Ann. 1-12-104 (1988). *Curran v. Pasek*, 886 P.2d 272 (Wyo. 1994).

3. All calls/communications utilized by the state clearly fall in this category. Petitioner's marriage and well established confidential marital communication did not dissolve at arrest or pretrial detention. The martial communication privilege bars introduction at trial any confidential communications between spouses. Therefore, a warrant was required by special agent Trimble to invade into the privacy of petitioner's marriage, and spousal privilege. See *United States v. Apodaca*, 522 F.2d 568, 570 (10th Cir. 1975).

4. It is United States Supreme Court precedent that during pretrial detention all pretrial detainees' rights are retained with the expectation to institutional security. At no time did the detention center staff review calls for the legitimate security of the institution. The calls were illegally seized by the Department of Criminal Investigation. Special agent Tina Trimble failed to secure a required warrant and is not a Natrona County Detention Center employee, whose primary concern is the institutional security. The State's entire case-in-chief relied on the telephone calls. The State had no personal knowledge of the expression and direction of all the people involved in the phone calls, therefore the state took petitioner's calls out of context and fabricated violent crimes. *Dickeson v. State,* 843 P.2d 606 (Wyo. 1992), *Bell v. Wolfish,* 441 U.S. 520, 535, n. 16, 99 S.Ct. 1861,(1979).

5. Trial and appellate counsel are ineffective for failing to raise, investigate, and advocate this issue in trial and on direct appeal all in violation of the United States Constitution, and the Wyoming Constitution, and Wyoming Statute Ann. § 1-12-104. Therefore petitioner's conviction should be reversed and remanded for new trial.


**#5  Appellate counsel was ineffective for failing to raise Title III of the Omnibus Crime Control and Safe Streets Act and illegally seized calls. Trial Counsel was ineffective for failing to have calls excluded due to Title III.**

1. Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C.S. §§ 2510-22, generally forbids intentional interception of wire communication, such as telephone calls when done without a court order authorization. An unlawfully intercepted telephone call may not be offered as evidence in a trial. 18 U.S.C.S. § 2515, 18 U.S.C.S. § 2511 (2)(C).

2. Petitioner was a pretrial detainee placed in twenty three hour a day lock down. He was not given an inmate handbook. The Natrona County Jail is obligated to provide this handbook to inmates once they were moved to population. Petitioner was never moved to population; therefore petitioner never received the handbook, which may have stated that his calls could be monitored. Petitioner was never given the Miranda warning and never signed any Miranda waver form or waived his constitutional right. However he did invoke his constitutional right to remain silent.

3. The Natrona County Jail telephones are not clearly marked that **all calls are recorded**. The same phone that is used for attorney calls is also used for personal calls. Plus, the recorded message that came on during attorney calls, "that this call is subject to recording and monitoring," came on during personal calls. This recorded message was the only notice of the recording of petitioner's calls, and it was ambiguous and confusing. Specifically, to the mentally impaired and learning disabled. The message never stated you must consent to the recording. And the use of, "subject to be," is misleading. It implies that the calls can be monitored for security of the institution at the time the call is placed and recorded only when a potential security issue is present.  Implying the computer has a program that is set up to recognize specific security words and at that time begin recording. At no time was it understood that petitioner's private calls could and would be used as evidence in his trial.

4. Petitioner has a documented history of learning, and comprehension disabilities, plus being emotionally disturbed; and as a result, was placed in special education and alternative schools in his formative years. The learning disabilities, psychological disorders, and a chemical imbalance due to methamphetamine withdrawal certainly influenced petitioner's cognitive ability to understand that the telephone conversations were being recorded. At no time did petitioner give permission, or consent for the recording of his private communications with his wife and family.

5. Moreover, a warrant is required by Special Agent Trimble to seize and intrude into petitioner's private telephone calls and impermissibly obtain evidence that would be utilized at trial. The Wyoming and United States Constitutions require probable cause to seize and use the conversations in trial. Agent Trimble's actions are in violation of Title III Omnibus Crime Control and Safe Streets Act, and both the United States Constitution and Wyoming Constitution. Therefore, all calls illegally seized and utilized to obtain a conviction are unconstitutional and must be excluded. Petitioner is entitled to a new trial without the impermissibly obtained telephone calls.

6. Trial and Appellate counsel are ineffective for failing to raise this in trial and direct appeal all in violation of the Wyoming constitution and the United States Constitution. Appellant Counsels failure to raise this issue rendered her ineffective in violation of the sixth and fourteenth amendments of the United State Constitution, and Art. 1§4, 6,9,10 of the Wyoming Constitution. Therefore, Petitioner's convictions should be reversed and remanded for a new trial.

**#6 Appellant and Trial counsel were ineffective for failure to raise the United States Constitution Fifth Amendment and Article 1 § 11 of the Wyoming Constitution when the State utilized petitioner's communications as reliable and truthful evidence against him.**

1. The Fifth Amendment guarantees the government cannot compel a defendant to be a witness against himself. The word (witness) in the Constitutional text limits the relevant category of compelled incriminating communications to those that are testimonial in character.                                                                                     *U.S. V. Hubbell*, 147 L. Ed. 2d 24, 120 S.Ct. 2037 (2000).

2. The factors to be weighed in the balance include, but, are not limited to the integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process. "The Confrontation Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against self-incrimination.

The Confrontation Clause--like those other constitutional provisions--is binding, and the United States Supreme Court may not disregard it at its convenience." *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, (2008)

3. Petitioner's "inculpatory communications" were not under oath; therefore are not trustworthy and must not be allowed as testimonial evidence. Petitioner's public defender did invoke the right to not testify, and yet, the state introduced the inculpatory calls and compelled an impermissible admission of spousal privilege. There was no adversarial or confrontation process in trial as petitioner and his wife did not testify. The prejudicial and untrustworthy one sided picture painted by the State clearly exhibits that petitioner's public defender failed to zealously argue for the exclusion of the telephone calls or even challenge the relevance or validity of the telephone calls.

4. Appellant counsel egregiously failed to raise Fifth Amendment violations regarding the illegally seized phone calls that were utilized to compel petitioner and his wife to be a witness against him. More notable is the fact that the public defender failed to file a pre-trial motion concerning this Fifth Amendment violation and to vigorously argue for the exclusion of the testimonial communications/phone calls.

5. Appellant and Trial Counsel violated Petitioner's rights as guaranteed in the Wyoming Constitution Art. 1§4, 6,9,10 and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Therefore, Petitioner's convictions should be reversed and remanded for a new trial.

**#7 Appellant Counsel failed to raise ineffective assistance of trial counsel for failing to motion the court pretrial, or during Voir Dire for a change of venue.**

1. Prior to trial, the community was inundated with Television, Radio, and Newspaper articles for a period of approximately two months that portrayed petitioner as guilty before the benefit of a trial. Based on petitioner's sensational and inflammatory case the jury should have been sequestered to avoid the obvious prejudice. Petitioner specifically recalls that every day during the trial he heard about his trial on the radio on the transport back to the jail. Petitioner's media exposure was limited given his (twenty three hour a day lock down) incarceration. But most certainly the jury pool was saturated with the

overplayed media coverage. Obviously, the media influenced and infected the integrity of the trial and the jury. And yet, trial counsel refused to submit a motion for change of venue. The Trial Court must have been aware of the media coverage and should have sua sponte ordered a change of venue to another county. During voir dire; Juror Ms. Dewitt remembered seeing a picture of petitioner on TV, and stated in front of the jury that "I think if I did see him, **he was in *orange***, and I notice he's not today." Also, when asked "without saying what you heard but knowing that you saw something, does that at all in any way influence the way you might be a fair juror for this trial?" she replied, "no. If-no." The "if" is the word that should have been looked into. "If" is implying that she was debating in her own mind if she was able to be fair and impartial. Juror Ms. McCormick admitted to being exposed to media coverage, and yet, they were both seated on the jury. Mr. Charvat also remembered the newspaper articles.               (TT, 52-53)(TT, Vol. I, pg 153)

2. This Court abused its discretion in failing to properly inquire into the potential bias of jurors in violation of Wyoming Constitution and the United States Constitution. See specifically *Harlow v. Murphy*, 05-CV-039-B (D. Wyo. 2008). *Rosales-Lopez v. United States*, 451 U.S. 182, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981).

3. Appellate Counsels failure to raise ineffective trial counsel rendered is ineffective counsel in violation of the Sixth and Fourteenth amendments of the United States Constitution, and Art. 1§4, 6,9,10 of the Wyoming Constitution. Therefore, Petitioner's convictions should be reversed and remanded for a new trial.

**#8 Appellant Counsel failed to raise on Direct Appeal that the jury had members that were bias and predisposed. Trial counsel failed to adequately Voir Dire potential jurors and the District Court's inadequate voir dire rendered the process virtually meaningless and violated the Wyoming and United States Constitutions.**

1. During voir dire, Mr. Marken, the prosecutor, stated that "this is the who-do-you-know phase of the trial. And normally, I ask juries if – if anyone knows me, but from looking at the panel, it seems like I should ask if anyone doesn't know me, raise your hand because I recognize a lot of people on the panel." There were approximately seventeen people in

the potential panel that knew Mr. Marken. Evidently, Mr. Marken used this opportunity to bolster his authority in the community and that he should be trusted due to his long time service as a State criminal prosecutor and selected a jury pool of his peers and not petitioners.

(TT, pg. 52)

2.  Egregiously and notably, prospective juror Mr. Loyd told the jury panel that petitioners' name came up in a federal trial in front of Judge Downes and that he was the jury foreman. That, this trial was a "criminal case 9 - - 11 counts of possession, possession with intent, firearm, trafficking. We served for thirty five days I think. It was very lengthy, a lot of evidence." The state asked Mr. Loyd if he heard petitioner's name in that other trial and the response was, "*yes*". Even though Loyd was not picked as a juror in this trial, his statements of attaching petitioner to this, big drug and gun trial, infected the jury with undue bias and 404(b) evidence that petitioner was associated with a convicted gun packing, drug user/dealer. This cannot be allowed, especially in the presence of the potential jurors. It prejudicially implies petitioner has been involved in criminal activity of the same type and got away with those crimes. This injuriously and prejudicially infects the integrity of Voir Dire. Furthermore, even Mr. Loyd recognized his influence because he stated in the Judges chambers that **"I'm sorry I had to bring you guys in here*. I hope I didn't influence anybody out there*. Name rung a bell. I didn't know what to do. I was bothered by it. I never had that reaction."** Loyd also states **"I served over there. I never had - - I mean, I feel horrible. I really do."** In other words, he knew he infected the jury, and he knew what he did was wrong. The Court knew what he did was wrong, and should have excused that jury panel and pooled a new jury. Regardless of funding, inconvenience, or time constraints. The right to an impartial jury and fair trial is binding. The trial judge is responsible for insuring a defendant is not denied his right to trial by an impartial jury.          (TT, pg 75-95)

    *United States v. Gillis*, 942 F.2d 707, 709 (10th Cir. 1991)

3.  Mr. Hernandez is the first juror impaneled. His wife, Ms. Molly Hernandez worked for the Department of Family Services (DFS), up until recently. Defense counsel prejudiced petitioner by asking: "*Knowing that there's a prior conviction involved here, potentially for the same crime that Mr. Cohen is currently looking at, how does that make you feel?*"

4. Mr. Hernandez: "**well I think that I - - I could hold separate what's currently going on. I mean, I guess it's - - it could be in the back of my mind**, but I would have to focus on the current issue and hold that separate."

    Defense: "and you feel you could do that?"

    Mr. Hernandez: "Yes."

5. Defense counsel's admission is not only prejudicial but in complete defiance of the District Court's order prohibiting the introduction of a prior felony. Nevertheless, this is the only question that was asked of Mr. Hernandez and he was obviously conflicted in his own mind if he could ignore a prior conviction or not. This was flagrant ineffective assistance of trial counsel. Defense counsel and the District Court should have investigated into this more thoroughly to establish if there were any more prejudices present that may have stemmed from his wife's employment at DFS.        (TT pg 144-145)

6. Ms. McCormick was the second juror seated and admitted to her niece being convicted of a felony methamphetamine charge in another state. The State then asked, "**All right from what you know about her and her circumstance, was she treated fairly by law enforcement and the prosecuting agency?**"

7. Ms. McCormick replied "**I wasn't present, so**." Not only did Ms. McCormick not answer the question properly. No other questions from the state were asked to develop bias or prejudice.

8. Defense asked "Has anyone ever had a friend or a family member that was pretty wild maybe when they were young, but had been able to straighten their life out?"

    McCormick replied her "niece."

    Defense: "How do you feel about her life now?"

9. McCormick "she's come full circle she's where she should be." Neither the state nor defense asked her how she felt about methamphetamine given her families involvement. More importantly, neither side asked if she had any prejudice toward people who had used methamphetamine. Defense counsel, the state, and more so, this Court should have looked into this juror further to inquire if she was going to convict based on the alleged use and distribution of methamphetamine. Because of her families personal involvement. (TT pg 111-112,148). In *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979),

the court found that the fact that a juror's sons used heroin barred any inference that juror could be impartial in a case in which defendants were charged with distributing heroin.

10. The third person voir dired and seated is Ms. Dewitt; the only questions asked by the State was "Do you have any commitments or problems that would prevent you from focusing on this trial over the next week or so?"

11. Ms. Dewitt replied "None that I can't work around." This statement implied that there was, but that she would attempt to put it aside regardless, of the inconvenience of being a juror.

12. The Defense asked the panel "we're not sure if the defendant is going to testify or not. So is there anybody who can tell me why a person may not want to testify in their own behalf? Anyone? Any ideas?"

Ms. Dewitt immediately replied: "**Just maybe keeping their story the way its been                                    from         the beginning, maybe.**"

Defense "Okay, so making sure that they can tell their story when they get on the stand- -"

13. Ms. Dewitt **"the way they told it from the beginning."** In other words, Mrs. Dewitt had her mind made up that criminal defendants have a propensity to be untruthful and guilty. And, if they don't take the stand in there own behalf they must be guilty. Mrs. Dewitt's preconceived opinions of criminal defendants are biased and prejudicial.

14. Defense asked "How many of you had a wild family member?"

Ms. Dewitt answered "Family member. She straightened her life out pretty good although her ex-husband hasn't. But, I mean, I don't know what- - where do you want me to go with that? How I feel about that?" The Court and Defense counsel should have explored into this more thoroughly to see how pervasive the bias towards the ex-husband was and how his continued wild behavior might have affected her life and may still have been affecting it. This wild side was never explained and what it exactly pertained of and if the ex-husband used methamphetamine. This is a prejudice that should have been explored.

(TT 139-40,146-7)

15. The forth juror seated was Ms. Baxter. This juror was not voir dired, and as a consequence, there is no way to determine if she had any bias or prejudices. Trial

counsel, the State, and the Court failed their fundamental duty of voir dire in not asking any questions of this imminent juror. "Voir Dire" stands for to seek the truth, but in this instance and several others the system failed. It did however seat an inadequately Voir Dired jury panelist.

16. The fifth juror seated was Mr. Reece. The state asked him only one question: "Okay. Lets see here. Mr. Reece, you indicated you have been on a jury in the last six months or so, year or so. Where are you? There you are."

Mr. Reece: "I was called for jury duty, but I wasn't seated."

The State: "Was that in this Court or across the street in Circuit Court?"

Mr. Reece: "Actually, they called the morning of and canceled it, so we didn't show up."

The State: "So you never actually served on a jury and rendered a verdict?"

17. Mr. Reece nodded. Again, as the record reflects, this juror was not adequately Voir Dired. And, as a consequence, there is no way to determine if he had any bias. Trial counsel, the State, and the Court failed their fundamental duty of Voir Dire in not asking any questions of this imminent juror. "Voir Dire" stands for to seek the truth, but again in this instance and several others the system failed to seat an adequately Voir Dired jury panelist.                                                                          (TT pg. 118-119)

18. The State asked: "who knows me." Mr. Charvat who was the sixth juror to be seated replied **"I've had some experience with your boss, Mr. Blonigen, in the District Attorney' Office in homicide cases. I'm in "Parents of Murdered Children" having had a stepchild murdered. But I don't know you. I've never had anything to do with you. I think it was only Mr. Blonigen and Mr. Schafer that I've been involved with at all."** This admission is outrageous. Mr. Charvat has an indisputable alliance with the District Attorney's Office and should have been rejected outright by all parties, and more so by the trial court.

19. The State asked Mr. Charvat "are you concerned that, at least from what you know of this case, that you would not be able to be a fair and impartial juror?"

Mr. Charvat replied "No, I have no concerns about that."

20. Mr. Charvat by his own admission had lost a loved one to a violent crime. The depth of his loss for sanctioned revenge is undeterminable, but unequivocally present. Mr. Charvat

openly and defiantly admitted that his was friends with Mr. Blonigen and Mr. Schafer, and he believes this friendship to be a *"positive and personal relationship."* Mr. Charvat openly boasted that he had a positive and personal relationship with the District Attorney's Office, but, this admission notwithstanding Mr. Charvat is seated. Had he been petitioner had a positive and personal relationship with any juror, the State and the Court would have summarily had that juror excluded for cause.                    (TT, Vol. I, pg 54-5)

21. Mr. Charvat candidly admitted that his own daughter was a victim of a gun crime involving domestic violence. Mr. Charvat goes on later in the proceedings and states "My wife and I are both close to your victim witness advocates in the DA's office, the Sheriff's Office, and the Police Department, so - - because of only via homicide stuff." He also states that his "interest in the homicide is only in support of the victims." Again, this prejudice is blatantly clear. This juror should have been immediately excused for cause by the Court. Mr. Charvat by his own admission is an advocate for victims of violent crimes, and close friends with all areas of law enforcement specifically, the Casper Police Department. The alleged victim is a Casper police officer, whom Charvat considers to be a close and personal friend.

22. This Court was duly aware that Mr. Charvat was a dominant presence during voir dire. This provided him an opportunity to advocate his favorable opinions regarding the District Attorney's Office, and specifically the Casper Police Department. Moreover, Mr. Charvat's biased views would have certainly been incorporated into the jury deliberations and ultimately petitioner's conviction. "Implied bias can be proved by showing that the juror had a 'personal connection to the parties or circumstances of the trial'" or when there are "similarities between the personal experiences of the juror and the issues being litigated." Id., quoting Gonzales, 99 F.3d at 986.

23. The District Court, trial counsel and the prosecution failed the very essence of voir dire by allowing this juror to be seated.                    (TT, pg 64-67)

24. The seventh juror to be seated was Mrs. Branscom. She admitted to having family that worked  in law enforcement in Johnson County.
    Defense counsel asked: "would you weigh their testimony any more or less creditable than a lay person?"

Mrs. Branscom: "No."

Defense: "are you going to have any concerns, as Mr. Marken mentioned, that this attempt, is potential on a police officer? Does that give you any questions as to whether or not you could be fair and impartial in this case?"

Mrs. Branscom: "**It doesn't give me any questions. It's the same as a person off the street, so.**"

25. Mrs. Branscom made a revealing admission. She firmly believes and declares that there is a tangible difference between law enforcement and a person off the street. Mrs. Branson's manifested predisposition is indisputable. Egregiously and yet again, defense counsel failed to acknowledge and adamantly demand that this imminent juror be dismissed sua sponte.                (TT pg 137).

26. The eighth juror to be seated and ultimately jury foreman was Mr. Schultz. The State asked him "I noticed that you were related to or close friends with a law enforcement officer."

Mr. Schultz: "My Future Father-In-Law Works For The Sheriff's Department."

State: "Who's that?"

Schultz replied: "Wayne Reynolds."

State: "Do you have any concern that if - - if you were to render a verdict in favor of the defendant here that he would not be your future father- in- law or any thing drastic like that?"

Schultz replied: "No, I think we're okay."

27. This admission is outrageous. This Court, the State, and trial counsel clearly heard Mr. Shultz admit that he had close family ties in local law enforcement, and yet, he was seated and even more prejudicially elected jury foreman.

28. Defense counsel asked "Knowing your father in law the way you do, would you judge the credibility of the officers who are going to testify in this case any differently than you would any other person?"

Schultz responded: "**I don't think so.**"

 Defense: "So you don't find police officers to be more credible then a lay witness?"

Schultz: "No."

Defense: "You feel you could be fair and impartial in this case?"

Schultz: "Yes."

29. At first Mr. Schultz was debating in his mind if he would give more weight to the credibility of law enforcement then a lay witness. Defense counsel clearly should have objected and had this juror excused. At the very least, this juror should have been questioned more to develop his prejudices, especially since his future father-in-law was in law enforcement. (T.T. pg, 120, 130-31).

30. The ninth juror to be seated was Ms. Hendricks. As the record clearly reflects, this juror was not even voir dired, and as a consequence, there is no way to determine if she had any bias. Trial counsel, the State, and the Court failed their fundamental duty of Voir Dire in not asking any questions of this imminent juror. "Voir Dire" stands for to seek the truth, but in this instance system failed to seat an adequately and legally voir dired jury panelist.

31. The tenth juror to be seated was Ms. Hunt. Her only admission is that she is a teacher at South ridge School and does not know prospective juror Ms. Hogan who was also a teacher at South ridge School. As the record reflects, this juror was not adequately Voir Dired. And, as a consequence, there is no way to determine if she had any bias. Trial counsel, the State, and the Court failed their fundamental duty of Voir Dire in not asking any questions of this imminent juror. "Voir Dire" stands for to seek the truth, but in this instance and several others the system failed to seat an adequately voir dired jury panelist.

(TT pg 60, 118)

32. The eleventh juror to be seated was Ms. Butler-Pacheco. The record is again insufficient to tell if this juror had any bias or prejudice. The only thing known about this juror was she was called to jury in an unrelated case but did not serve. As the record reflects, this juror was not adequately Voir Dired. And, as a consequence, there is no way to determine if she had any predisposition or bias.

33. The twelfth juror seated was Ms. May. The only information available is that she was related

to an attorney. Again, the record is insufficient to determine her bias and prejudices. As the record reflects, this juror was not adequately Voir Dired. And, as a consequence, there is no way to determine if she had any bias.

34. The thirteenth juror or alternate was Ms. Degattis. Again, the Voir Dire record contains no testimony from this juror either. However, Ms. Degattis during the course of the trial realized that one of the officers testifying in petitioner's trial was involved in her life. That she had personally witnessed this Casper police officer fabricate and use threats to intimidate its citizens, and yet' Ms. Degattis is not seated on the behalf of the defense, but as an alternate juror. And the Court did not see problem with this juror since she was an alternate and not involved in the deciding of the facts. Simply put, the jury was prejudicially stacked to favor of law enforcement.

35. These alleged crimes are alleged to be against law enforcement and to seat jury members whom were related or had any degree of relationship with law enforcement was extremely prejudicial. Not to mention, an allegiance to the District Attorney's Office and law enforcement. Due process of law guarantees a criminal defendant the absolute right to an impartial jury. Further more, the jury that was paneled for his trial should have been appropriately questioned and allowed to express if they have formed any opinions about petitioners guilt. Petitioner's trial was not a "capital" trial but, he was   facing life with out the possibility of parole which is an unequivocal death sentence by incarceration.

36. Furthermore, the State asked during voir dire; "I want to go back to the topic of methamphetamine for just a moment. I've been working on this case quite a bit, so I'm not keeping up on the news. But it seems like I heard that there's a methamphetamine conference that was starting in Casper sometime soon, maybe even today. How many of you believe that the methamphetamine problem as it's described in Natrona County or in our country is perhaps blown out of proportion by the media or by law enforcement types? Anyone feel this it's really an overdone issue? Okay."

37. The Court interrupts this questioning and tells the state he is at his guideline for time and he may have ten more minutes due to the number of hardship excusals. But not before the State made sure the jury was aware of the methamphetamine conference that was being held in Casper to address the prolific on going drug problem and the communities' duty to help fix the problem.

38. The State was not done influencing the jury with a duty to clean up the community, he then states "I asked about controlled substances, but I'm going to ask it now about firearms. Have any of you or any of your loved ones or close friends ever been involved

with - - involved in or convicted of or charged with a felony offense involving a firearm? Okay."

39. Again, Mr. Charvat immediately raised his hand to voice his views, "My stepdaughter's ex-husband when they were still married threatened her with a firearm, and he was arrested and charged, dealt with. And I don't even know how it all came out, but on a domestic violence issue. He had his firearm rights removed."

40. This entire colloquy is prejudicial, the Court had an obligation to exclude Mr. Charvat for cause. The defendant's right to an impartial jury includes the right to an adequately voir dire to identify unqualified jurors.

41. "The right to trial by an impartial jury is a fundamental concept of due process. In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. A fair trial in a fair tribunal is a basic requirement of due process. In the ultimate analysis, only the jury can strip a man of his liberty or his life. A juror must be as indifferent as he stands unsworn. His verdict must be based upon the evidence developed at trial." See Burton *v. Johnson*, 948 F.2d 1150, (10th cir 1991), *Sallahdin v. Gibson*, 275 F.3d 1211, (10th Cir. 2002).

42. This Court, the State and the public defender failed their fundamental duty of voir dire in not asking all of the potential jurors' questions and discovering their prejudices. "**Voir Dire**" stands for to seek the truth, but in petitioner's instance the system failed to seat an impartial jury. Furthermore, this Court abused its discretion by failing to reject predisposed and biased jurors.

43. Trial counsel was ineffective for failing to properly use defense challenges and appellate counsel was ineffective for failing to raise these issues on direct appeal. Petitioners Trial and Appellate counsel are ineffective for failing to raise this in trial and direct appeal all in violation of the Wyoming constitution and the United States Constitution. Appellant Counsels failure to raise this issue rendered her ineffective in violation of the fourth and fifth and sixth and fourteenth amendments of the United States Constitution, and Art. 1§ 10 of the Wyoming Constitution. *Miller v. State*, 904 P.2d 344, 352(Wyo. 1995), *Harlow v. Murphy*, 05-CV-039-B (D. Wyo. 2008), and *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S. Ct. 1629, (1981). Therefore, Petitioner's convictions should be reversed and remanded or a new trial.

**#9 Appellate counsel failed to raise the Brady/discovery violations by the State. Trial counsel failed to demand that the State surrender the Crime Lab Report of the testing performed on the gun.**

1. The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Evidence is "material" within the meaning of Brady only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule. *Smith v. Sec'y of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995). Seivewright v. State, 7 P.3d 24, (Wyo 2000). Harlow v. Murphy, 05-CV-039-B (D. Wyo 2008)

2. Special agent Tina Trimble testified prior to trial that she instructed the state to send the gun to the State crime lab for forensic testing. However, petitioner has been denied the results of such testing. Evidently, petitioner's fingerprints or so called inculpatory forensic signature was not present on the gun and more specifically not present on the alleged hair trigger. When special agent Trimble was questioned at trial about the testing results she had performed on the gun, she evasively replied, "I don't recall." Special Agent Trimble knew the answer to that question would completely discredit the States case, so she committed blatant perjury to secure petitioner's conviction.

3. Officer Wenberg testified he brushed a hard object out of petitioner's left hand. However, if the gun was forced out of petitioners hand there would be indelible evidence left on the gun. In fact, had the state found any inculpatory fingerprints on the gun then certainly the jury would have been duly informed. Officer Wenberg, the {alleged} victim testified he did not see a gun. Additionally, Officer Maton, Officer Wetzel, and Officer Reinhart testified that they did not see petitioner produce a gun. The driver of the vehicle, Mr. Virgillio, was prepared to testify that he did not see a gun, but he refused to testify for fear of prosecution.

4. Notably, in the State's opening statement, Mr. Marken clearly stated that the *"**gun falls out of petitioner's hand where it comes to rest"**. (TT 189) Sgt. Mark Trimble is the *only*

*witness* that testified to observing the gun in Petitioner's Non-Dominant Left Hand and yet, he irrefutably failed to react to the frenzied and immediate danger. Obviously, Sgt. Trimble never felt threatened and never perceived Officer Wenberg was in any danger of being harmed. Interestingly, Officer Wenberg testified at the preliminary hearing that Sgt. Trimble was not even present at the scene when petitioner was arrested. Regardless of the documented testimony, Sgt Trimble still failed the secure the weapon and indisputably leaves it within the reach of a known felon, Mr. Virgillio. Evidently Sgt. Trimble committed perjury, and did so to help further his wife's, (Special Agent Tina Trimble's) tenuous and new career with DCI. The validity of Sgt. Trimble's version of the events can easily be resolved by the forensic results. The failure to call witnesses to testify in petitioner's behalf is in violation of, *King v. State*, 810 P.2d 119, (Wyo 1991).   (Prelim March 14th, 2006, Docket No. CR-2006-0570, pg.8)

5. The state violated discovery by not disclosing to defense the forensic test results. Moreover, this exculpatory and impeachment evidence is relevant and crucial to petitioner's innocence. No fingerprints obviously demands no manifest intent to harm anyone, much less Officer Wenberg. The state has an obligation to turn over all discovery and not suppress the exculpatory crime lab results. Appellate counsel's failure to raise this on direct appeal is ineffective counsel. Trial counsel's failure to object to the state's non-disclosure of the test results is ineffective assistance of counsel.

6. Also, the failure to have independent testing performed is ineffective counsel. This discovery violation is prosecutorial misconduct.   *State v. Naple,* 2006 WY 125, *Seivewright v. State*, 7 P.3d 24, (Wyo. 2000) *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir 1995) *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194,(1963).

7. Petitioners Trial and Appellate counsel are ineffective for failing to raise this at trial and on direct appeal. This is a direct violation of the Brady mandate, Wyoming Constitution and the United States Constitution. Appellant Counsel's failure to raise this issue rendered her ineffective assistance of counsel in violation of the fourth and fifth and sixth and fourteenth amendment of the United State Constitution and Art. 1§4, 6,9,10, of the Wyoming Constitution. Therefore, Petitioner's convictions should be reversed and remanded for a new trial.

**#10 Appellate counsel is ineffective for failing to raise the unconstitutional search and seizure of evidence used to convict. Trial counsel is ineffective for failing to have evidence excluded due to the illegal search of 1434 South Melrose residence.**

1. Darwin Haselhuhn was arrested for possession of methamphetamine on March 2, 2006. This arrest was after officers observed Mr. Haselhuhn leaving his Melrose residence. Agent Trimble asked Mr. Haselhuhn for permission to enter and search his home. Mr. Haselhuhn affirmatively said "No." Disregarding Mr. Haselhuhn's denial of access, Agent Trimble entered the house devoid of consent and illegally seized evidence that was utilized in petitioner's trial.

2. Ms. Trimble testified that she called the home owner Mr. Allen Aipperspach. Mr. Aipperspach also refused her actual entry into the home and any adjoining structures, but, he did consent that Ms. Trimble, could look on the outside of his properties. Mr. Aipperspach testified that Ms. Trimble asked him about the weapons that were located inside the home. Furthermore, Officer Wetzel testified that he never seen the guns inside the home when the search warrant was executed. Unequivocally, showing that the guns were already seized prior to the execution of the fabricated search warrant.

3. *"Suppression remains an appropriate remedy if the judge issuing a warrant was misled by information in a affidavit that the affiant knew was false or would have known except for his reckless disregard for the truth..."* See Leon, 104 S.Ct. 3413.

   *Neither the federal nor the state constitution forbids all searches and seizures; rather, they prohibit unreasonable searches and seizures. Guerra v. State, 897 P.2d 447, 452 (Wyo. 1995). Warrantless {43 P.3d 103} searches and seizures are unreasonable per se, with but a few exceptions. Gehnert v. State, 956 P.2d 359, 362 (Wyo. 1998); Morris v. State, 908 P.2d 931, 935 (Wyo. 1995).*

   *"No Warrants shall issue, but upon probable cause, supported by Oath or affirmation" This Fourth Amendment protection would be "reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile." Franks v. Delaware, 438 U.S. 154, 168, 98 S. Ct. 2674, 2682, 57 L. Ed. 2d 667 (1978)*

*A district court must suppress the evidence obtained during the execution of a search warrant "to the same extent as if probable cause was lacking on the face of the affidavit" if the testimony at a Franks hearing persuades the court that two conditions are met. 438 U.S. at 156, 98 S. Ct. at 2676. First, "the allegation of perjury or reckless disregard [for the truth] is established by the defendant by a preponderance of the evidence." Id. Second, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."*

4. There is only one conceivable way that Agent Trimble could have known about the guns and that was to enter the house illegally and seize them without probable cause or a warrant. Agent Trimble obviously provided the court with false information to obtain the warrant for the Melrose home. Agent Trimble committed perjury to obtain the warrant and as a consequence should have been impeached.

5. The facts notwithstanding, the public defender, Ms Collier did not file a motion to suppress (pursuant to Rule 12 WRCP) upon the finding of the information that Ms Trimble committed perjury to obtain the warrant. Trial counsel should have immediately motioned the court to suppress the illegally obtained evidence. Ms. Trimble committed perjury in her affidavit that the home owner gave her permission to enter and therefore the fruit of the poisonous tree doctrine must apply. See *Dickeson v State,* 843 P.2d 606 (Wyo 1992)

6. Agent Trimble committed perjury and the State suborned perjury. Plus, a Franks hearing is required to exclude the evidence obtained by police illegally. Appellate and trial counsel are ineffective for failing to raise and advocate this issue in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Art. 1§4, 6,9,10 of the Wyoming Constitution. Therefore, Petitioner's convictions should be reversed and remanded for a new trial

**#11   Trial counsel tried but was unsuccessful at impeaching Ms. Trimble based on fabrication in her testimony. Appellate counsel failed to raise this prosecutorial misconduct and ineffective Trial counsel on direct appeal.**

1. The State committed prosecutorial misconduct by suborning perjury in allowing state officers to commit perjury. In support states the following: Agent Trimble testified in the Partial Motion Hearing held on Oct. 4th, 2006, that petitioner and his family had moved out of the Melrose residence before March 2nd, 2006. She further testified that Mr. Haselhuhn and his family had moved in by March 2[nd,] 2006. However, under oath, and before the jury, Agent Trimble fabricated and changed her testimony to intentionally mislead the jury that petitioner had in fact lived in the Melrose home on March 2nd, 2006. Agent Trimble committed perjury. Moreover, she had no documented evidence to support her testimony.  (P.M.H., pg. 44)   (TT, 374-75)

2. Agent Trimble further testified that on March 2nd she entered the Melrose home with the permission of the home owner Mr. Aipperspach; however Mr. Aipperspach testified that he never gave Agent Trimble permission to enter the home. Nevertheless, she illegally entered the home and seized two guns, scales, paraphernalia, and utilized them in petitioner's trial.                                        (T.T. 816-17)

3. The items Agent Trimble observed during the illegal search were a black duffle bag, and a large green Tupperware tote box. These specific items were later found in a black Camaro belonging to Mr. Wheeler, (Whom officers never locate or question). Ms. Trimble testified that these items belonged to petitioner. She based this on erroneous speculation that she observed them at the Melrose residence, where petitioner once lived, weeks prior. By her own testimony, in all earlier proceedings, petitioner did not reside at the Melrose residence on this day, or weeks prior to the illegal search.

4. When Agent Trimble testified to the jury that petitioner was living in the Melrose house on March 2nd, when she **illegally** entered it. She implied that the specific items that she had seen in the home were the same items that were later found in the black Camaro, and that they belonged to petitioner, and not the passenger of the Camaro and actual owner, Mr. Haselhuhn. Mr. Haselhuhn told Agent Trimble and involved officers that **(he)** was living in the Melrose house, **but not petitioner.** Testimony shows Mr. Haselhuhn was arrested for possession of Methamphetamine on March 2nd, 2006, and had syringes in his truck. Testimony also shows that the police found syringes in the Melrose home. Mr. Haselhuhn's insurance card to his truck was found in the home next to the computer. Mr.

Haselhuhn was the passenger of the black Camaro on March 3rd, 2006. Agent Trimble had petitioner in her sights and was willing to commit perjury to get a conviction.

5. Agent Trimble fabricated her testimony to show petitioner was living in the Melrose house and therefore, connected the implied ownership to petitioner of the items found in the black Camaro, and from the Melrose home. Agent Trimble committed perjury to convict petitioner charges that stemmed from the search of Mr. Wheeler's Camaro, and the seizure of Mr. Haselhuhn's belongings. The prejudice is clear, Ms. Trimble committed perjury and must be impeached and held accountable.

6. During opening statements the State committed prosecutorial misconduct by clearly misstating evidence several times. The State in his opening statement claimed the surveillance on the Melrose home was on March 1st and 2nd, however, March 2nd was the only day of surveillance and on that day (the 2nd) officers seen a white pickup truck leaving those premises, and that Mr. Haselhuhn was driving. This was true, however he went on to state that **"Mr. Haselhuhn was arrested at that point for unrelated issues relative to his vehicle."** This was perjury. Mr. Haselhuhn was arrested for possession of methamphetamine. The State knew this, but chose to mislead the jury. Furthermore, Mr. Haselhuhn has been convicted in the past for aggravated robbery (*Haselhuhn v. State*, 727 P.2d 280,), and other federal crimes that petitioner is personally aware of. Petitioner believes there are also federal controlled substance conviction and several federal probation violations due to methamphetamine use. (Mr. Haselhuhn has an extensive criminal history.) The jury should have been informed of all relevant factors, not the one sided version the State gave them.

7. Appellate and trial counsel are ineffective for failing to raise this in trial and direct appeal in violation of the Wyoming constitution and the United States Constitution. Appellant Counsels  failure to raise this issue is ineffective in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments and Art. 1§4, 6,9,10 of the Wyoming Constitution. Therefore, Petitioner's convictions should be reversed and remanded for a new trial.


**#12 Appellate counsel and trial counsel failed to investigate and offer the exculpatory testimony of Luther Myers.**

On the day in question, the police confiscated the black Camaro. Inside they found a duffel bag that contained Mr. Luther Myers's California Drivers License and the methamphetamine utilized to convict petitioner of drug charges. However, if trial counsel would have subpoenaed Mr. Myers to trial he would have testified that he witnessed Mr. Darwin Haselhuhn personally place the duffel bag into the black Camaro or at least asked how his Drivers License turned up in the duffel bag. More importantly, Mr. Myers and Mr. Haselhuhn both had criminal records, and yet, Agent Tina Trimble never bothered to question either one, but only charged petitioner with possession and possession with intent, even though Mr. Haselhuhn was the passenger in the Camaro. Mr. Myers would have also testified that Mr. Haselhuhn was known to use and carry methamphetamine, they were best of friends and that they lived together prior to Mr. Haselhuhn moving into the Melrose house in late January, early February when petitioner and his family had moved out. Mr. Myers could have testified that Mr. Haselhuhn had a violent criminal past. And that he had seen Mr. Haselhuhn with the fragmentation vest. Defense counsel's failure to effect service of process on an eye witness, or in the alternative, to request a continuance until that eye witness could be compelled to testify, is per se ineffective assistance of counsel.

See *King v State*, 810 P.2d 119, (Wyo 1991).

1. Mr. Myers could have easily made the connection for the jury that the belongings and the methamphetamine found in the Camaro actually belonged to the passenger, Mr. Haselhuhn. There are numerous actors involved in actual culpability, because petitioner was not alone in the Camaro. However, the State adamantly presented that scenario to the jury. Nevertheless, Petitioner implored Trial Counsel to locate Mr. Myers to explain all this to the jury - but trial counsel never locates and investigates this exculpatory testimony. The *Brady* evidence is very clear. See *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995), and Seivewright *v. State*, 7 P.3d 24, (Wyo 2000).

2. Appellate and trial counsel for failing to investigate and raise this in trial and direct appeal in violation of the Wyoming Constitution and the United States Constitution. Appellant Counsel's     failure to raise this issue rendered her ineffective in violation of

the Fourth, Fifth, Sixth, and Fourteenth Amendments and Art. 1§4, 6,9,10 of the Wyoming Constitution. Therefore, Petitioner's convictions should be reversed and mandated for a new trial.

#### #13   Trial Counsel and Appellate counsel were ineffective for failing to object to, and raise on appeal Special Agent Trimble's prejudicial involvement and influence in Petitioner's trial.

1.  Agent Trimble was allowed to participate in the Voir Dire process. Agent Trimble sat at the prosecution's table and directly influenced the State's decision in which jurors were best suited for their case. Agent Trimble does not have a law degree and is not a state prosecutor. Sitting at the State's table bolstered her credibility as a witness and is extremely prejudicial. Ms. Trimble should have been sequestered from the courtroom and only allowed to testify in her capacity as a State's witness. Furthermore, Agent Trimble was allowed to hear testimony from other witness's and then accordingly adjust her injurious testimony. The prejudice is flagrant, repugnant and obvious.

2.  Agent Trimble's testimony in all hearings prior to trial was that when Agent Norcross reached into the black Camaro his entire torso was trapped inside the driver's window as petitioner drove away and that petitioner tried to trap agent Norcross between two cars. However, this was wholly fabricated. Agent Norcross testified that he reached into the vehicle up to his shoulders and moved out of the way. Agent Trimble's testimony dramatically changed after she heard Agent Norcross testify. She clearly altered her testimony to "I believed that at that time."

3.  If, Agent Trimble was not allowed to hear Agent Norcross testify, petitioner would have clearly shown the jury that the lead investigator had an ability to fabricate testimony and committed perjury to win her case at all cost. Plus, petitioner would have been able to impeach her testimony, numerous times. Evidently trial counsel meekly attempted to impeach Ms. Trimble, but she was inexperienced and woefully unprepared. If trial counsel could have shown the jury Ms. Trimble's ability to fabricate and willingness to misstate the facts to obtain an unconstitutional conviction, there is a reasonable probability that the verdict would have been in petitioners favor. This is prosecutorial

misconduct to allow state representatives to mislead, suborn perjury and deny constitutional guarantees.

4. Appellate and trial counsel are ineffective for failing to raise this in trial and direct appeal in violation of the Wyoming Constitution and the United States Constitution. Appellant Counsel's failure to raise this issue rendered is ineffective in violation of the Fourth, Fifth, Sixth and Fourteenth Amendment and Art. 1§4, 6,9,10 of the Wyoming Constitution. Therefore, Petitioner's convictions should be reversed and remanded for a new trial.

#14  **Trial counsel failed to object to the "expert witness" testimony from Ms. Susan Cerullo, and appellate counsel failed to raise this on direct appeal, is ineffective counsel.**

1. The State submitted illegally obtained evidence of conversations in the form of "snippets". Ms. Cerullo testified as an expert witness, that it is impossible to edit, modify, or alter calls that were recorded by the jails IT phone system. She also admits the system itself states "Date Modified" if any change to a account has been made. "Modified" is just that "Modified". (TT, 232-235).

2. Ms. Cerullo is not an expert concerning the IT telephone system. A few hours of classes does not qualify as an expert. Ms. Cerullo's testimony claiming that the phone calls cannot be changed, altered, or modified, is perjury. The State altered the calls by using "snippets". Ms. Cerullo admitted that the call can be copied in whole or just a portion of a call, which alters the context of a conversation. Mrs. Cerullo's expert testimony is in direct violation of *Daubert v. Merrell Dow* , 509 U.S. 579, 113 S.Ct. (1993), and *Kumho Tire v. Carmichael,* 526 U.S. 137,119 S.Ct. 1167 (1999).

3. More importantly, Ms. Cerullo admitted that once the calls are copied to another disk they can then be changed or altered, plus she failed to maintain a chain of evidence and as result, the discs were not accounted for.          (TT pg 234)

4. Nevertheless, trial counsel failed to object to this alleged expert testimony and is ineffective assistance of counsel, and appellate counsel's failure to raise this on direct

appeal is ineffective assistance of counsel. An evidentiary hearing, and a legally voir dired expert witness is necessary to show the obvious perjury.

5.  The state elicited false testimony and perjury from Ms. Cerullo. Petitioners Trial and Appellate counsel are ineffective for failing to raise this in trial and direct appeal all in violation of the Wyoming constitution and the US constitution. Appellant Counsels failure to raise this issue rendered her ineffective in violation of the fourth and fifth and sixth and fourteenth amendments of the US Constitution, and Art. 1§4, 6,9,10 of the Wyoming Constitution.

**#15  Appellate counsel and trial counsel was ineffective for failing to object to the State committing prosecutorial misconduct by inflaming the jury with the term "Bullet Proof Vest," opposed to the factual term of a "Fragmentation Jacket."**

1.  The Prosecution committed prosecutorial misconduct by repeatedly misstating evidence admitted in trial. The prosecution repeatedly referred to a fragmentation jacket as a bullet proof vest. A "bullet proof vest" is capable of resisting the impact of a bullet. But a "fragmentation jacket" only provides protection from shrapnel, or larger projectiles. The flak jacket will only deflect fragments or projectiles. The state did admit at a bench conference that the vest was a "flak jacket"     (TT, 804)

2.  Moreover, the "Flack Jacket" never belonged to petitioner and had the state tested the vest there would have been nothing that would have linked it to petitioner. This vest was found in Mr. Wheeler's Camaro, a friend of Mr. Haselhuhn's. Furthermore, Mr. Haselhuhn was the passenger of the Camaro and his personal belongings were found inside the vehicle. The state testified that petitioner was taking Mr. Haselhuhn out to his truck at E&F Wrecking Service to obtain his vehicle, where Mr. Haselhuhn had the rest of his belongings. Mr. Haselhuhn has an extensive criminal history including but not limited to aggravated robbery. The jury should have been informed and made fully aware of these relevant facts.

3.  Prosecution took advantage of the irrelevant prejudicial inference that criminals get these Bullet Proof Vests to protect themselves from police. For the state to make this unsupported inference that 1) That Petitioner is a criminal, 2) That the vest was actually

his, 3) That the only reason anyone, including petitioner, would have this jacket is to protect himself from the police, is ridiculous and extremely prejudicial. There is not any reliable evidence to support this fragmentation vest was even petitioners. The Prosecution stated the prejudicial unsupported inference that petitioner was ready   to attack the police and go to war with any policeman that got in petitioner's way, (because Petitioner "was a desperate man, in desperate times"), due to the finding of the vest in a car that was not even petitioners, with belongings that were not his. If this irrational inference the state alleged was true, petitioner would have been at least wearing the vest. Plus the fact, petitioner would have had a weapon ready upon the officer approaching the vehicle, and he would have got into the gun fight that the state alleges was imminent. The inference that petitioner was ready to go to war with law enforcement is unsupported, outrageous, and extremely prejudicial

4. In the State's closing argument, the state told the jury that his drama teacher "John Walsh" always said you don't bring a gun on the stage unless you intend to use it. The state used the "drama" of a violent cop show "America's Most Wanted" to prejudice the jury. Everyone knows the extremely dangerous people that "America's Most Wanted" puts on TV. This television reference is prosecutorial misconduct. The prosecution further stated only a dangerous man would have such a dangerous weapon. Put the three unsupported inferences of the bullet proof vest, the extremely desperate dangerous man, and the deadly gun there was only one conclusion the jury could return, that was the illegal conviction now before this Court. This prosecutorial misconduct is in violation of *Dysthe v State,* 2003 WY 20.

5. Furthermore, petitioner does not have any history of violence or aggression. There is no family violence, no simple assaults, no felony assaults, and has never hurt anyone in his life. He has nothing in his history that would indicate that he is capable of physically harming another human being.

6. The prejudice petitioner suffered is clear. The state committed prosecutorial misconduct and trial counsel failed to object and offer expert testimony, and appellate counsel failed to raise this issue on direct appeal, all in violation of the rights guaranteed by the United States Constitution and the Wyoming Constitution.

**#16 Trial counsel failed to object to the alleged gun expert and extremely prejudicial firearm testimony which inflamed the jury. The failure to object to the repeated prejudicial testimony was ineffective assistance of counsel, appellate counsel failed to raise this issue on direct appeal. The State committed prosecutorial misconduct by this statement.**

1. When the prosecutor asserts his credibility or personal belief, an additional factor is injected into the case. This additional factor is that counsel may be perceived by the jury as an authority whose opinion carries greater weight than their own opinion: that members of the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor, an important state official entrusted with enforcing the criminal laws of a sovereign state. While the prosecutor is expected to be an advocate, he may not exploit his position to induce a jury to disregard the evidence or misapply the law. *Barela v. State*, 787 P.2d 82, 83-84 (Wyo. 1990). *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire v. Carmichael,* 526 U.S. 137,119 S.Ct. 1167 (1999).

2. More egregious is the fact the State introduced Officer Wetzel as an alleged gun expert witness in violation of *Daubert and Kumho Tire, Id.* This witness was never voir dired to determine the actual extent of his expertise. He was allowed to testify unchecked by the defense as an expert. Officer Wetzel was allowed brandish the gun and manipulate the weapon in front of the jury to show how easily the weapon fired. Explaining to the jury how deadly and dangerous this particular weapon was.

3. Trial counsel failed to object to this inflammatory testimony and the manipulation of the weapon, no shots were fired therefore the rest was irrelevant and appellate counsel failed to raise this on direct appeal.

4. Appellate counsel and trial counsel are ineffective in violation of the United States Constitution and the Wyoming Constitution and consequently petitioners' convictions should be reversed and remanded for a new trial.

**#17 Appellate counsel is ineffective for failing to raise the eighth amendment violation of cruel and unusual punishment for the charging and conviction of the attempted first degree murder and aggravated assault of Officer Wenberg.**

1. The State committed a manifestly unjust act when it amended its original charging information to include the charges under Wyoming Statutes § 6-2-101(a) First-degree Murder and § 6-1-301(a)(i) which states:

   > "6-1-301. Attempt; renunciation of criminal intention.
   >
   > (a) A person is guilty of an attempt to commit a crime if:
   >
   > (i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A substantial step is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime." Id. (Emphasis added and original.)

2. This amended information was not based upon any definable act at the time of the commission of the crime which would have conclusively demonstrated the necessary mens rea to commit the acts charged in the new, amended information. Had there been sufficient indicia of this intent, it would certainly have followed as a matter of law and common sense that Petitioner would have been charged with these offenses in the original information based upon the observation of those in the best position to determine the "intent" of the Petitioner.

3. Had the Petitioner taken a "substantial step" at the time of the offense to commit the act of First-degree Murder, the officers, trained in the science and observation of criminal activity, would have noticed this "substantial step" and Petitioner would have been charged accordingly based upon the officers statements at that time when the events were fresh in their minds. If, that is, the Petitioner had not been shot for taking such a substantial step.

4. To charge Petitioner with an amended information, based upon contradictory statements issued through a false sense of bravado on behalf of the Petitioner while trying to impress a person over the phone and with such a lack of corroborative evidence at the time of the offenses to warrant such severe charges in the original indictment is violative of the Petitioner's Constitutional rights under the Fifth, Eighth, Fourteenth Amendment of the

United States Constitution and those of the Wyoming State Constitution, and as a consequence, Petitioner's convictions should be reversed and remanded for a new trial.

**#18 Appellate counsel failed to raise the cumulative error effect. Because of the numerous errors made to obtain the unconstitutional conviction.**

1. Each of the errors discussed above was of sufficient magnitude to warrant reversal. The cumulative effect of these errors was to taint the proceedings beyond redemption. However, even if these had not warranted reversal standing alone, their cumulative effect is such that reversal is necessary in order to secure petitioner's right to a fair trial.

2. Under the doctrine of cumulative error, a sequence of incidents, each in itself insufficient to warrant reversal, may assemble in such a way as to deprive a defendant of a fair trial. When this happens, reversal is required. *Schmunk v. State,* 714 P.2d 724, 726 (Wyo. 1986). The record is clear, petitioner has met his burden of proving that several unequivocal rules of law were breached which denied petitioner his right to a fair trial. Therefore, petitioner respectfully requests that this Court reverse his convictions and remand for a new trial.

## In Conclusion:

1. Petitioner's trial was seriously flawed due to the above Constitutional violations. The State committed perjury on numerous occasions to illegally convict and confine petitioner. The State used chemically imbalanced and psychologically impaired communications that were expected to be private between wife, family, and himself. The State suppressed valuable Brady material and discovery, misstated numerous facts all in a successful parade to mislead the jury and obtain this illegal conviction. The Court appointed Ms. Collier, the public defender whom failed her duty to investigate, advocate, and provide the very fundamental duties of a defense attorney. Petitioner's innocence is rather simple and obvious, even the State agreed at the time of arrest, due to the charging of no violent crimes. However, the State seen an opportunity to misuse the 404(b) evidence in this case and presented to the jury whom was made up of mostly friends and family of local and

state law enforcement. Petitioner did not receive a fair trial. Petitioner did not receive effective assistance of trial counsel. Petitioner did not receive effective assistance of appellate counsel and trial counsel. Therefore, petitioner must respectfully request this Court to reverse his illegal convictions and grant appropriate relief.

2. Appellate counsel is ineffective assistance of counsel. If job related deficiencies were the reason, for her termination then the record should reflect that Ms. Domonkos was unable to fulfill her role as appellate counsel. The fact that the State Public Defender did not find her fit to do her job and fired her must be part of the record. Appellate counsel's deliberate indifference to draft a meaningful and meritorious appeal provides patent ineffective assistance of counsel.

3. Additionally, trial counsel was ineffective assistance of counsel based on her numerous pretrial and trial errors; The public defender, Ms. Collier, failed to file a motion in limine, failed to object to the State's weapon expert, failed to object to the State's IT Telephone System Expert, failed to demand the missing discovery, failed to properly voir dire potential jurors, failed to have the gun forensically tested, failed    to investigate exculpatory witnesses, failed to investigate inconsistent State witnesses and subsequently impeach them, egregiously fail to notice and investigate petitioner's present and ongoing psychological status, and specifically the erratic and aggressive behavior exhibited over the phone and while incarcerated in the Natrona County Detention Center.

4. An evidentiary hearing is required to fully develop a documented record of ineffective assistance of appellate counsel and trial counsel to support the Petition for Post-Conviction Relief. Petitioner acknowledges all facts and information contained in this brief are true and correct to the best of his knowledge. Any documents not included in this brief are due to petitioner's inability to obtain them and completely argue them due to his incarceration. Petitioner has asked this Court for assistance of counsel on numerous occasions to prevent any further violations of his rights, but has been unsuccessful. Again, Petitioner has ongoing psychological issues, no training in the law, no legal aid or advocate, but duly submits this Amended Petition for Post-Conviction Relief.

5. Please refer to amended Petition for Post-Conviction Relief and all exhibits cited in this brief. Petitioner is indigent and unable to afford the cost of copies.

WHEREFORE, Petitioner prays that this Court:

1.      Grant this Motion for Habeas Corpus Relief, direct that Petitioner's conviction be vacated and that Petitioner be discharged from his unconstitutional confinement; or in the alternative,

2.      Grant petitioner an evidentiary hearing;

         Grant Petitioner such other and further relief as may be deemed just and proper.

3.      Grant the assistance of counsel to prevent any further violations of constitutional magnitude.

4.      Petitioner has tried to give the States highest Court full opportunity to fix and address the errors made by both the District Court and the State Supreme Court.

5.      Petitioner now prays this Court will fix this illegal conviction and remand for a new trial.

Dated this _23rd_ day of _September_ ,2013.

Zacharia C Cohen, pro se 24465

Witnessed _____ Zeb Harris

On this _23rd_ day of _September_ , 2013.

Cohen # 24465
box 400
Rawlins WY 82301

FROM AN INMATE AT THE
WYOMING STATE PENITENTIARY

Sept 23, 2013

Clerk of United States District
2120 Capitol Ave Rm 2131

Cheyenne WY 82001